KANE SHIELDS, GUARDIAN, V. AULTMAN, MILLER & CO. ET AL.

Decided January 14, 1899.

1. **Homestead—Conveyance by Husband—Wife Insane.**

A husband whose wife is hopelessly insane may convey the homestead without the appointment of a guardian for the wife.

2. **Same—Deed Effectual Upon Abandonment.**

The conveyance of a homestead by the husband without the joinder of his insane wife would not be wholly void, even if the insanity of the wife did not make it valid; and if the homestead were subsequently abandoned, the deed would thereupon become effective to convey the property.

APPEAL from Dallas. Tried below before Hon. W. J. J. SMITH.

*Dickson & Moroney,* for appellant.

*Porter & Cohron, Alexander, Clark & Hall,* and *W. A. Bonner,* for appellees.

FINLEY, CHIEF JUSTICE.—This suit was filed on April 25, 1896, by plaintiff as guardian of the estate of Mrs. Sarah Izen, a lunatic, and wholly for her benefit. The plaintiff alleged his appointment as guardian by the County Court of Dallas County, Texas, and that his ward was, on May 1, 1893, the owner of and entitled to the possession of a certain lot in the city of Dallas, Texas, fronting 25 feet on the south side of Main Street by 100 feet deep, 50 feet west of St. Paul Street; and that the defendants, Aultman, Miller & Co., had illegally taken possession of said property and deprived plaintiff and his ward thereof. Plaintiff further alleged that on October 21, 1885, and for a long time prior thereto said property was the actual homestead of Mrs. Sarah Izen and

her husband, J. Izen; that on the said date the said Izen executed to J. J. Carnes a deed purporting to convey said lot; that the said Mrs. Sarah Izen did not join in the execution of said deed, and had never in any way ratified the same or abandoned the said property as her homestead; that the said deed was void, and that the said Aultman, Miller & Co. claimed under the said deed to J. J. Carnes; that on December 18, 1893, one F. H. Finley, who claimed title to said lot through said J. J. Carnes, executed a deed to the same to the said Aultman, Miller & Co., and as a part of the consideration therefor the said Aultman, Miller & Co. assumed the payment of a certain note for $2500, dated December 2, 1892, executed by F. H. Finley to J. J. Carnes, and that J. B. Adoue, the other defendant, was the legal owner and holder of said note; that the said defendants set up and asserted title and interest in said land. Plaintiff prayed for judgment for the land for the benefit of Mrs. Sarah Izen, and that the pretended claim of defendants be removed as a cloud upon her title.

The defendants filed their first amended original answer on February 17, 1898. After a general demurrer, general denial, and plea of not guilty, they pleaded specially that J. Izen sold the property in controversy on October 21, 1885, to J. J. Carnes, who was a purchaser for value in good faith; that Aultman, Miller & Co. claimed through this deed and were purchasers in good faith and for value, and that neither of the defendants had any notice of plaintiff's claim; that at and prior to the purchase of the property in question by J. Izen, his wife, Mrs. Sarah Izen, was insane, and only lived on said property while insane and in confinement, and that on this account she never acquired any homestead interest in it. They further pleaded that, at the time J. Izen sold said property to Mr. Carnes, Mrs. Izen was a resident of Missouri and had been for eight or ten years; that about April 7, 1885, J. Izen purchased lots 11 and 12, in block J, Cedar Grove addition to Dallas, Texas, for the purpose of making it his homestead, and shortly thereafter moved thereunto a house then situated on the Main Street property in controversy, and moved onto and occupied said lots Nos. 11 and 12 as a homestead for himself and children, and was so occupying and using it when he sold the Main Street property to Carnes, and for five or six months previously; that shortly after making said sale to J. J. Carnes, J. Izen moved from said lots 11 and 12, and shortly thereafter left Texas with his family; that his family remained together and constituted a family for several years after this, but neither he nor his children lived in Texas for eleven years prior to this suit; that Izen and his wife, Sarah Izen, had lived apart since about 1875, and she was no part of his family; that for a number of years Izen had lived separate and apart from his children, and they had each lived apart from each other and no longer constituted a part of the J. Izen family; that J. Izen had the right, as the head of the family, to make his homestead on lots 11 and 12 in block J, and to abandon the Main Street lots as a homestead, and that he did all of these acts in good faith and for the best interests of his family.

The case was tried on February 17, 1898, before a jury, and was submitted to them on special issues. The court gave judgment for the defendants, but this judgment was not entered, and on April 23, 1898, the court sustained a motion made by the defendants to enter the judgment nunc pro tunc, and gave judgment for the defendants for the land in controversy. Plaintiff thereupon gave notice of appeal, and brings the case to this court for revision.

The issues submitted and answers of the jury thereto are as follows:

"(1)   At the time of the execution of the deed from Joseph Izen to J. J. Carnes to the land in controversy, were said Joseph Izen and his children occupying the Sumpter Street property as a home? Answer: Yes, temporarily.

"(2)   Prior to the date of said deed, did Joseph Izen in good faith and without any intention of defrauding his wife, Sarah Izen, leave the property in controversy and with his children remove to the Sumpter Street property with the intention on his part of abandoning the property in controversy as a homestead? Answer: He did not.

"(3)   If you answer the issue submitted in paragraph numbered 2 above in the negative, then did J. J. Carnes at the time he accepted said deed have notice or knowledge that Joseph Izen was not acting in good faith toward his wife (if he was not), or did said Carnes have notice or knowledge of any facts or circumstances reasonably calculated and sufficient to put a man of ordinary prudence upon inquiry as to the purpose or intention of Joseph Izen, and if so, could said Carnes by prosecuting said inquiry with reasonable diligence have ascertained the intention of said Izen? By ordinary prudence is meant such prudence as a man of ordinary prudence would use under like circumstances, and by ordinary diligence is meant such diligence as a man of ordinary diligence would use under like circumstances. Answer: Yes.

"(4)   Did J. J. Carnes at the time he accepted said deed believe that Joseph Izen had in good faith abandoned the land in controversy as a homestead? Answer: No.

"(5)   At the time of the execution of the deed to the property in controversy by J. Izen to J. J. Carnes, was said property or any part thereof occupied in any way by J. Izen or any other member of his family, and if so, in what way? Answer: Yes, by sleeping there.

"(6)   Did J. B. Adoue purchase the $2500 vendor's lien note without or with notice or knowledge of the homestead claim of Mrs. Izen to the lot in controversy? Answer: Without notice or knowledge.

"(7)   Did F. H. Finley at the time he purchased the property in controversy from J. J. Carnes, or at any other time prior thereto, have any notice of the claim which Mrs. Sarah Izen is making to the property in controversy? Answer: No.

"(8)   Did Aultman, Miller & Co., at the time it purchased the property in controversy, or at any time prior thereto, have notice of the claim Mrs. Sarah Izen is now asserting to said property? Answer: No.

"(9)   Did J. Izen at the time he moved from the Main Street prop-

erty permanently abandon all or any part of said property? If so, what part? Answer: No.

"(10) Did J. Izen at the time he and his family resided on the Main Street property use same for any other purpose than a homestead? If so, what? Answer: Yes, for a saloon.

"(11). Did J. Izen at the time he and his family resided on the Main Street property use same for any unlawful or immoral purpose? If so, what? Anwer: Assignation house." .

*Opinion.*—The first contention presented·by the appellant, first and second assignments of error, is that he was entitled to judgment upon the undisputed evidence and the findings of the jury, and that the court erred in rendering judgment for the appellees.

His first legal proposition here urged is, that a married man whose wife is insane can not separately convey the homestead. That a guardian must be appointed for the insane wife and represent her in the conveyance in order to effectually pass the title to the homestead. Appellees insist that the wife being insane, the husband may convey the homestead as any other community property. The question, so far as we are informed, is one of first impression in this State.

Article 16, section 50, of our Constitution, prohibits the sale of the homestead by the husband without the consent of the wife given in such manner as may be prescribed by law. The statute requires that the wife shall join in the deed to the homestead, make privy acknowledgment, etc. Rev. Stats., arts. 636, 4643. Our statutes provide for appointments of guardians of the person and estate of persons of unsound mind, and in case such person be married, the husband or wife of such person, as the case may be, shall be entitled first in order to the guardianship. Rev. Stats., arts. 2735-2752. As to other community property the husband is invested with full and complete power and authority, and may convey title thereto without the consent or participation of the wife. Rev. Stats., art. 2968. Appellants cite us to Heidenheimer v. Thomas, 63 Texas, 287; Cason v. Laney, 27 Southwestern Reporter, 420, and Railway v. Bailey, 83 Texas, 19. These cases merely hold that the wife whose husband is insane can not convey the community estate. She must have a guardian appointed for the insane husband, and the guardian must act for him in the conveyance of the common property. These cases do not settle the point. The wife has no power to separately convey while the husband is sane; on the other hand, the husband may separately convey the community property while the wife is sane. But as to the homestead, the husband's power to convey is limited by the consent of the wife, expressed in the manner prescribed by statute. Under the statute she must join in the deed, under privy acknowledgment. As this piece of property is consecrated to the purposes of the domicile of the family, evidently the makers of the Constitution and members of the Legislature enacting the statutes deemed it wise and just that the personal free will and consent of the wife should be obtained to its alienation. No constit-

uent of the family, perhaps, is so deeply concerned in the fact of a home for the family as the wife, and the spirit of fairness and justice to her suggests that the home, once acquired and dedicated, should not be alienated without her consent, freely and voluntarily given. The husband, as the head of the family, may provide another homestead for the family and remove to it, and when this is done the homestead character of the former residence is lost, and the wife can not assert it. She does not acquire a peculiar property interest in the homestead which survives the loss of the homestead characteristic. The husband can not deprive her of the right to occupy it as a home, unless he has provided another homestead for the family. This is true as to the husband's separate property as well as to community. The fact that the property designated as the homestead is the separate property of the husband does not lessen the wife's interest in it as a homestead, nor affect her power to prevent its alienation by withholding her consent. He can no more effectually convey such a homestead without her consent than he can a community homestead. It is the *fact* of a homestead that is guarded and protected. Suppose then the property in question had been the separate property of the husband, on his wife becoming hopelessly insane did he not have the power to separately convey it? His wife had lost the power to consent. She no longer had any personal will to yield to that of her husband. Her power of choice and discretion passed away with the departure of her reason. She was no longer an intelligent partner of the community, equally loving and sharing the interests and responsibilities of the family. She was a pitiable, mindless, helpless charge, and, for all practical purposes, civiliter mortuus. It is not the consent of a crazy woman that the law contemplates as essential to the alienation of the homestead; it is the consent of the wife whose faculties of reason and discretion have not been dethroned. In the case of Clark v. Wicker, 30 Southwestern Reporter, 1114, we held that a married woman whose husband was insane could lawfully convey her separate estate. The idea upon which the holding was based was that the husband had become incapable of consenting and joining her in the conveyance. The matter of *personal* consent alone was needed, and it being put beyond the possibility of procurement by the insanity of the husband, the resort to guardianship would not attain the end designed by the law, and unless the wife was permitted to alienate the property through her own separate act, it would amount to a destruction of her property rights. In line with this idea is the proposition, frequently decided, that a married woman when separated from her husband may separately convey her separate estate (Wright v. Hayes, 10 Texas, 130), and, when necessary for the support and maintenance of herself and children, may separately convey the community property. Fullerton v. Doyle, 18 Texas, 13. In the case under consideration, the property was community property, and the homestead at the time of the sale, and was never abandoned, according to the findings of the jury upon the special issues submitted. Had the wife been sane, her consent to its alienation, expressed in the

way provided by law, must have been obtained in order to give the sale validity. Her personal consent was rendered impossible by her insanity; to have resorted to the guardianship proceeding, would not have obtained her consent, and unless the husband had authority to separately convey, the property was hopelessly tied up in his hands. It is an old established maxim that *the law never requires impossibilities.* We think it also clear that courts ought not to construe laws regulating the conveyance of property so as to unnecessarily and unreasonably interfere with personal proprietorship therein.

It is admitted in the pleadings of the parties, and an unquestioned fact in the case, that the wife was hopelessly insane when the property was occupied as the homestead; that she was in an insane asylum in St. Louis at the time it was sold by the husband, and that she has remained there and continued insane since.

Under these conditions we think the husband has the right to sell the property. The decision of this point is decisive of the appeal, but we will notice another phase of the case upon which appellees should have prevailed on the trial.

The sale of the property in question by Izen to Carnes occurred in October, 1885; at this time he and his children were residing upon the property bought by him on Sumpter Street, and his wife was confined in an insane asylum in St. Louis, where she had been since 1880, hopelessly insane. In 1886 Izen, with his children, moved away from the State of Texas, and since that time he and the children have lived in numerous places out of this State, including the State of Washington and British Columbia, and have never returned to Texas to live. The oldest daughter married in 1890, and ceased to live with her father. The other children became of age, and none of them have lived with him since 1893 or 1894. The last seen of the father he was at Vancouver, British Columbia, in 1894. The wife has continued insane and remained in St. Louis continuously since 1880. In the year 1890 Izen obtained a divorce from his wife in the State of Washington, and the custody of the minor children was decreed to him. The citation was by publication and mailing copy to Mrs. Izen, in care of the superintendent of the institution wherein she was confined as a lunatic. The notice complied with the statutory requirements of the State of Washington.

Before Izen moved to the Sumpter Street property he caused some of the improvements, a house of six rooms, to be moved off the Main Street property, the homestead place, and put upon the Sumpter Street lots. The house was moved off of the particular lot here in controversy, leaving houses still upon the other two lots, adjoining this on either side. The houses were connected when it was occupied by Izen and family. At the time of the sale to Carnes there was no house on the lot sold, and the other houses upon the other two lots were destroyed by fire about ten days later. Since that time the three lots have remained vacant and unimproved. In this condition, and without any notice whatever of the homestead claim, Finley bought from Carnes; Adoue bought the vendor

lien note executed by Finley, and Aultman, Miller & Co. bought from Finley, paying part cash and assuming payment of said note. In all these purchases the fair value of the property was paid. These facts do not appear in the findings of the jury, but they were shown upon the trial and are unquestioned in the record, and some of them are admitted in the pleadings. Under this state of facts, in our judgment, no other verdict and judgment than such as would deny a recovery to appellant could be justified.

Assuming that the insanity of the wife did not give the husband the right to separately convey the homestead, still his deed was not utterly void. If the homestead was subsequently abandoned, the deed became operative and effective, as a conveyance of the property by him. Marler v. Handy, 88 Texas, 422, and cases therein cited. At the time Finley bought the property it had been vacant for seven years. When Aultman, Miller & Co. bought, it had been vacant about eight years, and at the time this suit was brought it had continued vacant for eleven years. For ten years every member of the family had been a nonresident of this State; since 1890 the spouses have been divorced, and for several years the family, as such, has ceased to exist. In our judgment there has been a complete, thorough, and unquestionable abandonment of the homestead, and the deed of the husband should be held effective to convey the title.

We deem it unnecessary to discuss other questions presented. The judgment is affirmed.

*Affirmed.*

Writ of error refused.

Bookhout, Associate Justice, did not sit in this case.