J. B. WITHERS V. CHARLES LOVE.

No. 14,115.    (83 Pac. 204.)

SYLLABUS BY THE COURT.

HOMESTEADS—*Insanity of Wife—Conviction of Husband—Abandonment—Alienation—Estoppel.* A homestead occupied by the husband and children while the wife is insane and confined in an asylum is not abandoned by the husband's sentence and confinement for a term of years in the penitentiary and the removal of the minor children from the homestead, and upon the pardon and return of the husband no act or conduct of his can be held to constitute an abandonment or alienation of the homestead during the lifetime of the wife and while she continues insane; nor will such acts or conduct estop him from recovering the homestead in an action begun while the wife is living. So long as the wife is living noth-

ing the husband alone can do or suffer to be done will estop either of them from claiming the homestead. The case of *Adams v. Gilbert,* 67 Kan. 273, 72 Pac. 769, 100 Am. St. Rep. 456, cited and distinguished.

Error from Bourbon district court; WALTER L. SIMONS, judge. Opinion filed November 11, 1905. Reversed.

## STATEMENT.

THIS was an action in ejectment for the recovery of a farm of 160 acres in Bourbon county, and for rents and profits. Defendant had judgment below and plaintiff brings error. The petition was in the ordinary form under the statute. The answer of defendant pleaded all his defenses in detail, and the reply was in substance a general denial. From the pleadings and evidence the facts, about which there was little, if any, dispute, are as follow:

John B. Withers moved upon the land in 1864. The patent was issued to him in 1870, and with his family he occupied the land as a homestead continuously until 1879. At that time his family consisted of his wife and seven children. In May, 1879, his wife, Mary E. Withers, was adjudged insane by the probate court of Bourbon county, and was removed to the insane asylum, where she remained until her death, which occurred in 1904. After the wife's insanity plaintiff continued to occupy the land with his children as a homestead until September, 1892. On the 14th day of September, 1892, he was convicted of murder in the second degree, and on September 19, 1892, was sentenced by the district court of Bourbon county to the state penitentiary for a term of twelve years. This sentence was afterward commuted to three years, and he was restored to the rights of citizenship. April 9, 1895, he was released from the penitentiary and returned to Bourbon county, where some of his children were still living. At the time of his trial and sentence

two of his children (minors) were living on the land, and with them he was occupying it as a homestead.

On September 19, 1892, the day he was sentenced to prison, he executed and acknowledged a power of attorney appointing L. H. Mylius his lawful attorney to collect all money due him from any source, to rent his farm (the land in controversy), to fill out his pension vouchers and draw his pension, with power to sell any and all his property, real and personal, and out of the sales to pay his just debts. This power of attorney was recorded on the same day.

Mylius and John B. Withers were brothers-in-law, the wife of Mylius being a sister of plaintiff. On the same day that Withers executed the power of attorney to Mylius he resigned the guardianship of his insane wife, and the probate court of Bourbon county at the same time appointed Mylius as her guardian. Mylius immediately took charge of plaintiff's property, rented the land, disposed of some of the household goods, and placed the minor children, both girls, aged fifteen and seventeen years, with relatives who lived near the home.

On September 27, 1892, Mylius filed a petition in the probate court of Bourbon county for leave to sell the interest of the insane wife in the land in dispute, describing it as "her homestead interest as the wife of John B. Withers," and alleging that the sale would be for her benefit because the farm was liable to go to waste and would not rent for as much as could be procured from its value placed at interest. On October 15, 1892, the petition was allowed, and the sale of the wife's interest ordered, the same being referred to in the order as an "undivided one-half" interest. The proceedings in the probate court were continued from time to time until January, 1894, Mylius, the guardian, reporting that he had been unable to find a purchaser. On January 16, 1894, Mylius sold the land in controversy to Sam Alsop, executing to him, as attorney in fact for John B. Withers, what purported to be

Withers v. Love.

a warranty deed for the undivided one-half of the land,
for the consideration of $1250.   Of this, $1000 was
paid to Mylius in cash, and a note and a mortgage for
$250 were executed to him covering the farm, the note
and mortgage being payable to John B. Withers or his
attorney in fact, L. H. Mylius.

At the same time Mylius, as guardian of the insane
wife, executed to Alsop a guardian's deed for the other
undivided one-half of the land, the consideration being
$1250.   He took back a note for this sum and a mort-
gage on the farm, payable to himself as guardian.   The
probate court had approved the sale and ordered the
guardian to convey the undivided one-half interest in
the land to Alsop, and, after the conveyance, approved
and confirmed the deed.   The deeds and mortgages
were recorded and Alsop took possession of the land.

John B. Withers was visited occasionally while in
prison by Mylius, but, beyond being informed in a
general way that the farm had been sold, knew little
about the transactions until his release and return, in
April, 1895.   At that time Mylius made a settlement
with him and accounted for attorney's fees and other
obligations paid out of the $1000 received from the sale
of the half of the land, and the account was satisfac-
tory to Withers.   He accepted from Mylius without
question the balance in his hands, which amounted to
$172.90, and Mylius turned over to him the $250
mortgage which represented the remainder of the con-
sideration received for his half of the land.   After-
ward, when this $250 mortgage became due, he em-
ployed an attorney to collect it for him.

At the time of the settlement Withers was told by
Mylius that the latter held the mortgage of $1250
for the balance of the purchase-price of the farm, but
that before he could pay that there would have to be
an order of the probate court.   Withers understood
that this mortgage would not be due for some time,
but believed he would receive it when it became due.
He was not informed that two deeds had been made or

that the supposed interest of his wife in the land had been sold separately. He first learned at the trial the fact that separate deeds had been executed. He never demanded the money on this mortgage but did consult at various times different attorneys about it, and was informed each time that he never could get the money.

After his return from prison, and while he was in the neighborhood, on March 4, 1896, Alsop and wife sold and conveyed the land to Charles Love by warranty deed, the consideration being $2500, the same that Alsop had paid. This deed was recorded and Love went into possession under it. Love and Alsop were partners, however, in the cattle business and kept their cattle on the place in much the same way as before the transfer. Some improvements were made on the land by Alsop and Love, but beyond seeding it down to tame grass they amounted to very little.

Charles Love is defendant in this action. He also is a brother-in-law of plaintiff, the insane wife being his sister. All the parties were related in one way or another, Sam Alsop being married to a niece of Love and Mrs. Withers. They all resided in the neighborhood and all were familiar with the facts and circumstances surrounding this remarkable case. This action was not begun until January 28, 1903. At that time the wife of the plaintiff was still alive and insane. She died in the asylum on March 17, 1904, after the second trial of this case in the court below. The first trial was the usual formal trial in ejectment; the second was upon the merits, and the judgment was for defendant.

The $1250 note and mortgage given to Mylius as guardian of the insane wife was paid to him with interest by Charles Love, the defendant, who assumed its payment when he purchased the land; and the guardian kept the proceeds of this mortgage at interest and reported regularly to the probate court in reference thereto until the death of Mrs. Withers, after the action was begun. At her death her son, J. E.

Withers v. Love.

Withers, was appointed administrator of her estate, and Mylius as guardian paid this money—amounting to $1495—to him, and the administrator still holds it.

In the amended answer defendant pleaded: (1) The three-year statute of limitations as to rents and profits; (2) that Mylius contracted to sell the entire farm to Alsop, and as attorney in fact and guardian was legally bound, and intended, to execute a single deed conveying all the land, the deed to be a joint deed, but that through mistake Mylius executed two deeds, as described in the answer, and prayed that the deeds be corrected and that Withers be required to execute a good and sufficient deed to the land.

Upon the trial plaintiff proved his title and occupancy as a homestead; the value of the rents and profits; that he had been sentenced to the penitentiary, his sentence commuted, his rights as a citizen restored, and that he had been released from the penitentiary. Defendant in support of his title introduced the power of attorney from Withers to Mylius, the deed from Mylius, attorney in fact, to Alsop of the undivided one-half of the real estate, the proceedings in the probate court of the appointment of Mylius as guardian of the insane wife, the petition to sell her interest and all the proceedings in reference to the sale, the guardian's deed and confirmation, and the deed from Alsop to Love.

The court afterward, on motion, struck out all the evidence in reference to the power of attorney and deed by the attorney in fact, and the guardian's deed and proceedings in the probate court in regard to it, and rendered judgment for the defendant.

*W. P. Dillard, Willard W. Padgett,* and *R. B. Campbell,* for plaintiff in error.

*W. R. Biddle,* and *Hubert Lardner,* for defendant in error.

10—72 KAN.

The opinion of the court was delivered by

PORTER, J.:   Counsel, in addition to able oral arguments, have favored the court with well-prepared briefs which discuss every feature of the case, with ample citations of authorities.   The case presents some difficult questions.   The facts in many respects are remarkable.

A review of the evidence leaves no suspicion of bad faith upon the part of those who participated in the transactions, or of any attempt to gain an advantage over plaintiff by reason of the misfortunes which fell upon his household, culminating in September, 1892, when, with the mother of his children hopelessly insane, he was sentenced to the penitentiary for a term of years, and his children dispersed from the home the family had occupied so long.   On the contrary, it appears that all the brother-in-law Mylius did was undertaken with the purpose of conserving the interests of plaintiff and his family.   He cared for the minor children, sold the personal property, purchased necessaries for the insane wife, paid the debts of plaintiff, and on the latter's return rendered a satisfactory account of his stewardship.   While the petition to sell the supposed interest of the wife in the land was filed in the probate court within a few days after plaintiff was taken to prison, there was no undue haste in the proceedings to sell, and the sale made to Alsop was not completed until 1894 and brought the fair value of the land.

Plaintiff's preliminary contentions are:   That the power of attorney from plaintiff to Mylius was void, and all proceedings under it, including the deed made to Alsop, were void; that the alleged guardian's deed, by which Mylius attempted to convey to Alsop the undivided one-half of the land as the interest of the wife, was void; that the court below, after striking out of the evidence the power of attorney, the deed made as attorney in fact and the guardian's deed

to Alsop, committed error in refusing to strike out the deed from Alsop to Love, because with the former conveyances stricken out Alsop had nothing to convey. Error also is urged because the court refused to strike out all of the testimony of Alsop and Mylius in reference to conversations about the sale by Mylius to Alsop. The claim is made that, if the sentence and incarceration of Withers in the penitentiary and the wife's insanity rendered the deeds void, it left Mylius without authority as agent of Withers or of the wife to bind them in any respect.

The main contentions of plaintiff here, as below, are: (1) That the land was the homestead of plaintiff and his family, consisting of plaintiff, his wife, and children; that it never ceased to be their homestead while the wife lived; that the leaving of the homestead by plaintiff and wife did not constitute an abandonment, because it was involuntary, occasioned by the sentence to and confinement in the penitentiary of plaintiff and the insanity of the wife; that the sentence of plaintiff suspended all his civil rights, so that his acts were void; and that during his confinement in the penitentiary he could not abandon the homestead; (2) that plaintiff was not estopped by his acts and conduct from claiming the land; (3) that if the court should hold that the homestead is not involved because it was abandoned, still plaintiff should have recovered an undivided one-half of the land, as the doctrine of equitable estoppel would not apply to the part attempted to be conveyed by the guardian's deed because plaintiff never received the consideration paid for that portion, notwithstanding he might be held to have ratified the unauthorized act of Mylius in reference to the part conveyed as attorney in fact, for which he did accept the consideration.

Defendant vigorously maintains, on the contrary: (1) That the land was not a homestead; that the petition of plaintiff nowhere claims that it was a homestead; that as a matter of fact it was abandoned as a

homestead when the children of plaintiff left it after his sentence to the penitentiary and the furniture was removed from it; that if not abandoned by his act and the removal of the children it was abandoned by his acts upon his return from the penitentiary, because at that time his youngest children were of age and his family consisted of himself and wife; that she did not live with him and he did not support her; that she was insane, and if she were asked whether she desired to occupy or abandon the property she could not answer; that the act of occupancy must be that of a sane mind; (2) that every act of Mylius as agent of plaintiff was ratified by plaintiff with full knowledge of all the facts, after his disabilities had been removed and he had returned from the penitentiary, and, however void the power of attorney may have been, all that was done under it became valid and binding by the subsequent ratification; (3) that plaintiff is prevented by equitable estoppel from recovering the land or any part of it; (4) that the power of attorney was valid in law, and authorized Mylius to convey; that, while a person under sentence for a term of years cannot enter into executory contracts and call in aid the courts to enforce them, he may make a valid transfer of his property by will or deed.

We have stated here somewhat in detail the contentions of the parties, as set forth in their briefs, but many of them it will not be necessary to discuss. The trial court held that the sentence to the penitentiary of Withers for a term of years and his incarceration and confinement therein suspended all his civil rights, and that the power of attorney from Withers to Mylius and the deed from Mylius as attorney in fact for Withers to Alsop of the undivided one-half of the land were void. The court also held that the guardian's deed from Mylius as guardian of the insane wife to Alsop of the other undivided one-half of the land was void.

Plaintiff in error makes no complaint of the rulings of the court in those respects. He is satisfied they

were correct.   While counsel for defendant in error
argue at some length the question of the effect to be
given to the provision of section 2301 of the General
Statutes of 1901, by which the civil rights of a person
sentenced to confinement and hard labor for a term of
years are suspended, it is not necessary for us to con-
sider that question for the reason that no cross-petition
in error is presented, and whether the court's ruling
was right or wrong upon the validity of the power of
attorney and the deed made in pursuance of it is not
before us.   For the same reasons it must be assumed
that the correctness of the ruling upon the guardian's
deed and the proceedings taken in the probate court
are not open to discussion.   These rulings of the court
were made in excluding the testimony in reference
to the power of attorney and the deeds.   The court
found generally for defendant, and, aside from some
minor errors alleged in reference to certain oral tes-
timony, and the admission of the deed from Alsop to
Love, the main error relied upon is that the judgment
should have been for plaintiff upon the law and the
evidence.

Stripped of the unsubstantial matters, the questions
involved, and the ones upon which the judgment must
stand or fall, are narrowed down to these: (1) Was
this a homestead?   (2) Conceding that it was, is plain-
tiff estopped by his acts and conduct from claiming it?

That the land in controversy was originally the
homestead of plaintiff and his family is not disputed.
The insanity of the wife in 1879 and her confinement
in the asylum did not change its character as a home-
stead, for plaintiff continued to occupy it with his chil-
dren.   It was, then, the homestead upon the day he
was sentenced.  When did it cease to be the homestead?
His civil rights were suspended during his sentence
and confinement.   It is not necessary here to decide
the effect of such suspension upon his power to con-
vey or encumber his property, but merely the question
whether his involuntary absence under the sentence

and confinement amounted to abandonment, assuming that plaintiff by his own act might abandon the homestead during the insanity of the wife and her enforced absence in the asylum, a point we shall consider hereafter. His voluntary absence would not constitute an abandonment while the homestead continued to be occupied by the family, and his involuntary absence under sentence and confinement in prison should not be given that effect and the beneficent object of the homestead law defeated upon grounds which so apparently were never contemplated by the framers of the constitution. It was said in *Osborne v. Schoonmaker,* 47 Kan. 667, 670, 28 Pac. 711, 712, that "a person may be absent from his homestead without abandoning it as such. . . . It depends upon the character of his absence." (See, also, *Hixon v. George,* 18 Kan. 253.) It was not abandoned, therefore, by his absence and confinement.

The claim of counsel that the leaving of the home by the minor children and the removal of the furniture constituted an abandonment has no force or weight. The mother was insane, the father in the penitentiary, and the fact that under the enforced circumstances the home was unsuitable for their continued occupancy could not constitute an abandonment, if, as we have said, his absence under such circumstances was not sufficient. (*Shirack v. Shirack,* 44 Kan. 653, 24 Pac. 1107.)

It is urged that after plaintiff's release and the removal of his disabilities he returned to the neighborhood and not only made no attempt to occupy the homestead but with full knowledge of all the facts ratified the sale of the land, and, by his acts and conduct, and the lapse of years which intervened before this action was begun, he is estopped from claiming it as a homestead. This brings us to the main question in the case. With the wife alive and insane, could the husband by these acts, which it is claimed amounted to an equitable estoppel, alienate the homestead or abandon it?

The construction given by this court to the homestead law in the early case of *Morris v. Ward,* 5 Kan. 239, 243, has been uniformly followed. There it was said:

"There are at least two views which may be taken of these laws; one is, that the occupying of a piece of land as a homestead merely suspends the operation of any liens, alienations or encumbrances concerning it, during the time that it is so occupied as a homestead. . . . We do not adopt this construction of our homestead laws; we do not believe that the framers of the constitution intended to found the *homestead of the family* upon such a precarious foundation, or to protect it by such slight and fragile safeguards. The homestead was not intended for the play and sport of capricious husbands merely, nor can it be made liable for his weaknesses or misfortunes. It was not established for the benefit of the husband alone, but for the benefit of the family and of society—to protect the family from destitution, and society from the danger of her citizens becoming paupers.

"The other view of the homestead laws, and the one which we adopt, is that no encumbrance or lien or interest can ever attach to or affect the homestead, except the ones specifically mentioned in the constitution."

In *Locke v. Redmond,* 6 Kan. App. 76, 49 Pac. 670, affirmed in 59 Kan. 773, 52 Pac. 97, the wife was insane, and the husband as guardian for her borrowed $800, giving a mortgage on the homestead. After her restoration the wife contested the mortgage. The court held the mortgage void. In *Helm v. Helm,* 11 Kan. 19, 21, where the wife was compelled to sign a deed for the conveyance of the homestead by threats of her husband, and brought the suit to have the deed declared void, this court said:

"Our homestead provision is peculiar. The homestead cannot be alienated without the joint consent of the husband and wife. The wife's interest is an existing one. The occupation and enjoyment of the estate is secured to her against any act of her husband or of creditors without her consent. If her husband abandons her, that use remains to her and the family.

With or without her husband, the law has set this property apart as her home."

The case of *Chambers v. Cox*, 23 Kan. 393, was one where the wife never had been a resident of the state and had been abandoned by the husband without cause. The husband conveyed the homestead by his deed and took back a mortgage for the purchase-price. The suit was to foreclose the mortgage. The defense was failure of title because the wife had not joined in the deed. The court held that no title passed by the separate deed of the husband, notwithstanding the wife never had lived in the state. Mr. Justice Brewer, speaking for the court, said

"The separate deed of a married man to the homestead is void; it does not devest him of title, nor estop him from recovering the land. The question is not, Who will inherit from him? but, Has his title been devested? And the constitution says that his title to the homestead shall not pass, unless his wife joins in the deed. While the legislature may regulate the matter of inheritance, it cannot avoid or limit the constitutional provision for the protection of homesteads. The constitution forbids the alienation without the joint consent of husband and wife. It does not add, 'providing they are living together and occupying the homestead,' nor 'providing that both are residents of the state;' but the prohibition against separate alienation is absolute, when the relation of husband and wife exists. Whether any exception to this absolute prohibition were wise, it is not for us to inquire. The legislature has not attempted to make any, even if it had the power, but has repeated in the statute the very terms of the constitutional prohibition. (Comp. Laws, 1879, p. 437, § 1 [Gen. Stat. 1901, § 3016.]) Neither is the presence of both husband and wife essential to the existence of a homestead. Though one may have abandoned the other, yet either may have the children to care for and be the head of a family, and occupy a homestead." (Page 395.)

In *Ott v. Sprague*, 27 Kan. 620, a case where the wife had left her husband and the homestead and brought suit against him for alimony, he conveyed the home-

stead by a separate deed. The deed was held void, and a subsequent separate deed by the wife, made after the land ceased to be a homestead, was held not to convey title nor to make valid the original deed of the husband.

The following language, taken from *Morris v. Ward,* 5 Kan. 239, is repeated in *Coughlin v. Coughlin,* 26 Kan. 116, 117:

"No alienation of the homestead by the husband alone, in whatever way it may be effected, is of any validity; nothing that he alone can do or suffer to be done can cast the slightest cloud upon the title to the homestead; it remains absolutely free from all liens and encumbrances except those mentioned in the constitution." (See, also, *Howell, Jewett & Co. v. McCrie,* 36 Kan. 636, 14 Pac. 257, 59 Am. Rep. 584; *Wallace v. Insurance Co.,* 54 Kan. 442, 38 Pac. 489, 26 L. R. A. 806, 45 Am. St. Rep. 288; *Pilcher v. A. T. & S. F. Rld. Co.,* 38 Kan. 516, 16 Pac. 945, 5 Am. St. Rep. 770.)

It thus appears that almost every phase of attempted alienation of the homestead has been passed upon, and the provision of the constitution and the term "joint consent" have been construed with strictness and in favor of the homestead. This court has, however, recognized in a number of cases the doctrine, announced in *Sellers v. Crossan,* 52 Kan. 570, 35 Pac. 205, that the acts of those claiming a homestead may be such as to operate as an abandonment, or to estop them from claiming it. In that case the husband and wife had joined in a conveyance of the homestead, absolute upon its face and duly recorded, and afterward, as against innocent mortgagees, set up the claim that the deed was an equitable mortgage. The court held that their acts and conduct estopped them.

In *McAlpine v. Powell,* 44 Kan. 411, 24 Pac. 353, equitable estoppel was held to constitute a defense to a claim of a homestead, but it is to be noted that in that case no homestead rights were actually involved and the court in the opinion expressly found that the wife

had abandoned the Wyandotte homestead for twelve years and taken up a new home in Woodson county, and that the facts in the case took it out of the strict rules governing the alienation of a homestead.

The main reliance of defendant is the recent case of *Adams v. Gilbert,* 67 Kan. 273, 72 Pac. 769, 100 Am. St. Rep. 456. That case may be said to mark the extreme limit to which the court has gone in holding that the operation of the homestead law may be defeated by equitable estoppel. The facts in that case are these: Adams owned and occupied the land with his family as a homestead. His wife had been adjudged insane and was confined in an asylum. On October 20, 1893, he conveyed by warranty deed to one Foster, and the guardian of the insane wife joined in the deed. The deed was made to avoid creditors, the husband supposing that the homestead was not exempt. No consideration passed. On the same day Foster executed a mortgage for $2000 to Davis, a brother-in-law of Adams, Davis having no real interest. The note was turned over to Adams, who secured $700 upon it. The property was worth $800. Foster conveyed to one Kelley, without consideration, and Kelley conveyed to one Doran, who paid off the $700 mortgage. Doran took possession and expended $2000 in improvements, and, in 1898, sold to Gilbert, who made other valuable improvements. Adams abandoned the property in 1895. Mrs. Adams continued insane until her death, January 1, 1899. September 20, 1899, Adams brought ejectment. The court held that the deed to Foster was ineffectual at the time of its execution as a muniment of title, the property conveyed being a homestead and the deed lacking the joint consent of husband and wife, and said:

"While the marriage relationship continued and the property was occupied as a homestead, no act of the husband could be efficient to ratify or confirm such deed. The husband might by his actions, words, or silence, when he should have spoken, confirm a deed to

the homestead executed by himself alone, or estop himself from denying its validity, so as to make it convey title, after its homestead character had ceased, or after the death of the wife." (Page 275.)

The facts in that case differ materially from the facts here. Adams received the full consideration for the property, and stood silently by when he should have spoken and permitted more than $2000 in valuable improvements to be expended upon the property; and these acts should, in equity, have estopped him from claiming the property, unless the constitutional provision for the protection of the homestead prevented the estoppel because his wife was living. Then the death of his wife occurred, and the homestead character of the property ceased instantly. He had abandoned it already so far as he might do so. The wife's death completed the abandonment, and nine months after her death he brought the action. In the opinion the court said:

"In any event, after the death of his wife, the homestead character of the property ceased. At that time Adams was as fully informed as to the facts and the law as he was when this action was brought. He certainly might, even by his silence and inactivity, in time confirm and make efficient his former deed. We are not in a position to say the delay of about nine months was not sufficient for that purpose." (Page 277.)

While the decision is based in part upon the acts amounting to equitable estoppel, it really turns upon the fact that the wife's death occurred and completed the abandonment of the homestead; and nine months elapsed after her death before the action was brought, during which time the husband had full knowledge of the imperfections in the deed. Some expressions may be found in the opinion which apparently go so far as to suggest that the act of abandonment may have been completed by his acts prior to her death, and while she was insane, but these are not necessary to the decision and are not controlling.

Counsel for defendant also cite the case of *Shields, Guardian, v. Aultman, Miller & Co.,* 20 Tex. Civ. App. 345, 50 S. W. 219, in which the supreme court of Texas held that where the wife became hopelessly insane the husband had power to convey the homestead separately, because by the wife's insanity she lost the power to consent. We quote from the opinion:

"Her power of choice and discretion passed away with the departure of her reason. She was no longer an intelligent partner of the community, equally loving and sharing the interests and responsibilities of the family. She was a pitiable, mindless, helpless charge, and, for all practical purposes, *civiliter mortuus.* It is not the consent of a crazy woman that the law contemplates as essential to the alienation of the homestead; it is the consent of the wife whose faculties of reason and discretion have not been dethroned." (Page 349.)

The opinion comments upon the admitted fact that the wife was hopelessly insane, and counsel here urge that the evidence in this case is to the effect that Mrs. Withers was hopelessly insane; that she was, as to the homestead, *civiliter mortuus;* and that the reasoning of the Texas court is sound. This reasoning, however plausible, does not appeal to us, or furnish what appear to be solid grounds for breaking away from the well-established principle adhered to since the earlier decisions by this court.

It is difficult to see how effect can be given to the constitutional provision requiring the joint consent of husband and wife and at the same time hold that, while the wife is insane, the husband can either separately convey or by acts or conduct estop the wife from her right to claim the homestead, or estop himself from claiming it in his own right while she is living. The acts of estoppel must be such as will estop both. (*Law v. Butler,* 44 Minn. 482, 47 N. W. 53, 9 L. R. A. 856.) The same question was raised in *Panton v. Manley,* 4 Ill. App. 210, but left undecided. There the wife was insane and confined in an asylum. The husband exe-

cuted a mortgage upon the homestead, and upon fore-
closure attempted to abandon it under an agreement
with the mortgagee.   A statute then provided that
neither the husband nor wife could remove the  other
from the homestead without the consent of the other,
unless the owner of the property should in good faith
provide another homestead suitable to the condition in
life of the family.   The court said:

"It would seem that if the conveyance is to be helped
out according to the provisions of the statute, by aban-
donment of possession in case the husband has not
abandoned the wife, then, on principle, the wife's con-
sent to such abandonment should be obtained."   (Page
216.)

Upon the evidence the court held that no abandon-
ment was proved; and, while it suggests the question
whether the husband under such circumstances can
abandon the homestead, leaves it undetermined.   As
was said in *Morris v. Ward,* 5 Kan. 239, and *Coughlin
v. Coughlin,* 26 Kan. 116, "nothing that he alone can do,
or suffer to be done, can cast the slightest cloud upon the
title to the homestead."   In the case at bar the acts which
it is claimed amount to equitable estoppel were those
of the husband alone.   We, therefore, hold that noth-
ing he did or suffered to be done while his wife was
alive cast any cloud upon the title to the homestead, or
could estop either her or him from claiming this land
as the homestead during her lifetime.   After her death
his acts might have been such as to estop him from
setting up the claim of a homestead, but the fact that
Mrs. Withers was still alive and insane when this
action was brought is the controlling circumstance
which prevents the principles of equitable estoppel
from defeating his right to the land as a homestead.

The facts here relied upon to support the principle
of equitable estoppel as against plaintiff are not so
strong as in the cases cited.   It is true that Withers up-
on his return settled with Mylius, and so far as he had
power to do so ratified and confirmed the acts of his

attorney and agent in reference to the sale of part of the land. He accepted without question the proceeds of the sale to that extent. The only other facts that are relied upon are his knowledge that the other half of the purchase-price was represented by a mortgage, which he permitted the maker to pay to Mylius without protest, and the fact that he was silent when he should have spoken and permitted defendant, Love, to purchase from the first grantee. But the evidence shows no intentional misleading of Love, and that he was not misled in fact by plaintiff's silence. All the parties were equally cognizant of the facts with reference to the wife's insanity. Love was her brother, and knew all that Withers knew, and perhaps understood even better than Withers the facts in reference to the separate deeds.

There is a claim that valuable improvements were made while Withers stood by, but the evidence shows that these were slight and that the possession of the land by Love was not different from the possession of his grantor, Alsop. They were partners and continued to keep partnership cattle upon the land. Plaintiff, besides, was not a business man, nor nearly so familiar with business matters as Alsop and Love. He tried vainly to discover why it was that he could not secure the other half of the proceeds of the sale, and clearly never knew his rights, as claimed now, until a short time prior to the beginning of this action. The strongest point against him, aside from the acceptance of half the purchase-money, is the lapse of time that intervened after his return and before the action was begun. During this lapse of time the situation of the parties remained practically the same.

It is insisted that because Love paid the balance of the purchase-price to the guardian he is in the same situation as though he had paid it to Withers, because the latter knew of and ratified the payment. It was never paid to any agent of Withers, even assuming that Mylius was his agent, for Mylius held it in

Withers v. Love.

another capacity and refused to pay it to him.    There is nothing in the contention that Withers should have instituted some proceeding to recover this money. It never belonged to him in law or equity.    It was paid for the supposed interest of Mrs. Withers in the land when in law and fact she had no such interest, and Withers could not have established his right to it. The proceedings in the probate court for the sale of her supposed interest were void *ab initio.*

Plaintiff, therefore, was entitled to judgment for recovery of the land and for rents and profits, and the cause must be reversed for further proceedings.    While it has been said that "it is not within the equitable power of courts in this state to declare any indebtedness a lien on a homestead" (*Jenkins v. Simmons,* 37 Kan. 496, 15 Pac. 522), plaintiff in open court here and in his brief offers to do equity and to consent that defendant be given a lien upon the land for the $1250 plaintiff received from Mylius as purchase-money for the conveyance of half the land under the power of attorney, and to this offer plaintiff must be held.

The judgment, therefore, is reversed and the cause remanded for further proceedings in accordance with the views herein expressed.

GREENE, BURCH, MASON, SMITH, GRAVES, JJ., concurring.

JOHNSTON, C. J. (dissenting) :  Withers sold the land about thirteen years ago and received the agreed consideration.    Nine years have passed since his return from the penitentiary, and he has stood by and seen the land transferred and improved without claiming it or making any protest until this action was brought.    In various ways he has recognized the validity of the transfer and the title of his grantee. None of his family has occupied the land for the past thirteen years, and the youngest child reached majority about ten years ago.    No one is claiming a homestead interest in the land except himself.    In my view,

the facts, which are quite fully stated in the prevailing opinion, bring the case within the authority of *McAlpine v. Powell,* 44 Kan. 411, 24 Pac. 353; *Sellers v. Crossan,* 52 Kan. 570, 35 Pac. 205; *Sellers v. Gay,* 53 Kan. 354, 36 Pac. 744; *Adams v. Gilbert,* 67 Kan. 273, 72 Pac. 769, 100 Am. St. Rep. 456. Under the rule of these cases Withers is equitably estopped to assert that the title which he undertook to convey is invalid, and he is equally estopped to claim the land as against Love, whose rights in it he has long assented to and recognized. (*Shay v. Bevis, post* 208.)