Thompson v. Millikin.

---

No. 21,169.

MELISSA THOMPSON, *Appellee and Appellant,* v. WILLIAM H. MILLIKIN, *Appellant and Appellee,* et al.

SYLLABUS BY THE COURT.

1. HOMESTEAD—*Conveyance Executed by Wife Alone—Void.* Upon the facts stated in the opinion it is held that the instruments relied on by the defendants, affecting the plaintiff's homestead, are void because executed by her alone, the husband not joining therein or consenting thereto.

2. LIMITATION OF ACTIONS—*Defendant's Absence from State.* The finding that on account of the defendant's absence from the state the plaintiff's action was not barred, held to be supported by the evidence.

3. HOMESTEAD—*Occupied by Family of Owner—Voluntary Absence of Husband.* The homestead provided for by the constitution is one occupied as a residence by the family of the owner. The title being in the wife, who remained in possession with her children, the homestead character of the property in. question was not destroyed or impaired by the voluntary absence of the husband.

4. SAME—*Occupied by Wife and Children—Effect of Husband Acquiring Another Homestead in Oregon.* The fact that the husband entered and proved up on a homestead in Oregon, describing himself as single and unmarried—the law of that state requiring that a homestead be occupied only by some member of a family—did not of itself have the

effect to deprive him of his husband's interest in the homestead occupied by the wife and children, so as to validate the instruments in question.

5. SAME—*Conveyance by Wife Alone—Estoppel.* Having in good faith explained to the grantees concerning the long absence of her husband, the plaintiff is not estopped, either by such instruments or by her conduct or acquiescence, from maintaining this action.

6. APPEAL—*No Merit in Cross Appeal.* The cross appeal of the plaintiff examined and found to present no substantial error.

Appeal from Chautauqua district court; ALLISON T. AYRES, judge. Opinion filed April 6, 1918. Affirmed.

*W. H. Sproul,* of Sedan, *George J. Benson,* and *T. A. Kramer,* both of El Dorado, for the appellant.

*J. B. Tomlinson, Charles D. Shukers,* both of Independence, and *H. E. Sadler,* of Memphis, Tenn., for the appellee.

The opinion of the court was delivered by

WEST, J.: From the findings of fact it appears that the plaintiff, with four children by her first husband, one by her second, and four by her third, resided on lots 7 and 8 of the land in question (a tax deed to lots 5 and 6 being acquired by her in 1897) with her husband, who in 1894 left, ostensibly to seek a new location. Correspondence ceased after a year and a half, and she heard nothing further from or of him until 1908, when she learned from a relative his post-office address and sent to him by registered mail some photographs of their children, receiving a registered receipt. The registered letter sent thereupon was returned uncalled for. She heard nothing further from him until 1915, when her attorney located him in British Columbia. She was in correspondence with relatives, some of whom knew her husband's address, from 1895 to 1904, but appears to have learned or attempted to learn nothing from them concerning his whereabouts. In 1903 she executed an oil and gas lease covering all of the land, to L. A. Lockwood, fully informing him as to the absence of her husband. In the same year Lockwood gave to Millikin an option for the purchase of the lease, and on the same day Millikin told the plaintiff he was negotiating for this purchase, and at his request she agreed to be at Sedan the next morning

to see his attorney.   This she did, and fully and frankly answered all the inquiries, stating in substance that she did not know where her husband was and had not heard from him for more than seven years; that they had had no trouble before he left, and that she knew of no reason why he should leave her.   Millikin bought an assignment of the lease, informing Lockwood of what he had learned from the plaintiff touching the absence of her husband.   In January, 1904, plaintiff executed a quitclaim deed for lots 5 and 6 to G. W. Goss for $1,000, Goss being advised as to the absence of the husband and accepting the deed without his signature.   He afterwards deeded to D. E. Rathbun, retaining an interest in the lease.   In April, 1914, Rathbun by warranty deed acquired the rights of the patent holders, if any they had, to these lots and gave Millikin a lease thereof.   In the summer of 1903 Millikin drilled a dry hole on lot 6 about 1,800 feet deep.   Before November, 1904, he drilled and equipped eleven wells on the two lots, the equipment being removed before this action was begun.   From these wells a large amount of oil was produced, amounting in value, while Millikin operated the property, to about $57,000.   During the first year of development and operation the fences were down, but at the opening of the pasture season of 1906 plaintiff repaired the fences and has ever since remained in the actual, open, notorious, hostile, and exclusive possession, except as interfered with by the pumping operations and the final junking of the property in 1909.   She also kept the taxes paid, when not paid by some one else.   March 1, 1900, the husband made a settlement on an Oregon homestead and lived thereon until 1901, making improvements, and on November 9, 1906, made final proof, receiving a patent on May 22, 1907. The statute of Oregon requires only that some member of the family shall reside upon the homestead.   During all the operations on the land plaintiff was personally present, had knowledge thereof, made no objection thereto, and boarded some of the men in the employ of Millikin in such operations, and knew that he was expending a large sum of money therein. She never paid or tendered the repayment of the $1,000 received by her for her deed to lots 5 and 6 of the land in question, nor did she ever question Rathbun's title or right of possession until about the time this suit was begun.   In her reply she

offered to repay or credit the $1,000. It was expressly found that the plaintiff, the defendant and his assignee all acted in good faith.

The court reached the legal conclusion that sufficient inquiries were not made to justify a presumption that the husband was dead; that the land was the plaintiff's homestead, and its character as such was not destroyed or impaired by any act or declaration of her or her husband prior to the beginning of this action (June 6, 1910); that the plaintiff is not estopped; that owing to Millikin's absence from the state her action was not barred as to time; that she should recover a fair compensation for the oil taken from the land by Millikin before selling his interests in 1907; and that, considering the expense of production, one-tenth of the value of the oil, amounting to $5,709.15 with interest, less a credit of the $1,000, should be allowed her. The plaintiff was given judgment for $6,415.45.

The defendant appeals, and urges that the land was not the plaintiff's homestead, because it was not the homestead of her husband who was the head of the family and who obtained another homestead in 1907; that the plaintiff is estopped by reason of her conduct; that the equities of the case are against her; that the action is barred; and that improper evidence was received touching the running of the statute of limitations.

We do not find any merit in the last point, and hence must hold that the finding of the court as to the bar of the statute was well supported.

The remaining questions to be considered are those of homestead and estoppel, the latter of these embracing the question of the equities of the case.

It is argued that the land is not the plaintiff's homestead, because the head of the family acquired another, and one family cannot have two homesteads at the same time. The land from which the oil was produced was that acquired by the plaintiff several years after her husband left, and was added to and became a part of the land on which she continued to reside with her nine children.

While it is true that one person or one family may not have two homesteads at one time, it is of importance to note that the homestead provision of our constitution relates to property

"occupied as a residence by the family of the owner." (Const. art. 15, § 9, Gen. Stat. 1915, § 261; Gen. Stat. 1915, § 3825.) Of course, it is ordinarily the duty of the wife to take her children and follow the husband when he desires to change the place of family residence, but here we have no evidence that he either requested or desired that the wife follow him to any new location. From the plaintiff's testimony, it appears that after the loss of her first husband and the divorce of the second she bought lots 7 and 8 and moved on the land with her children, and two or three years thereafter she married E. F. Thompson, and shortly after the birth of her fourth child by him he went away. He had frequently gone away for a while and come back. She testified that when he left he said that "he was going out west to hunt a home for us and when he got located that he would send for us." But he neglected to do so. During all the years of his absence the widow with her children occupied the land she had originally purchased and, after 1897, that which she acquired by tax deed, and it would certainly be a lamentable result if we were compelled to hold that this peripatetic husband could by such absence destroy the homestead character of the family residence. In *Koons v. Rittenhause*, 28 Kan. 359, it was said:

"In many states the homestead exemption is given to the owner who has a family, or to the head of the family; but in Kansas it is given with special reference to the family, and must be occupied by the family as a residence." (p. 363.)

In *Withers v. Love*, 72 Kan. 140, 83 Pac. 204, in deciding the homestead rights of a husband who, after his wife became insane, had been confined in the penitentiary, some of his children still remaining on the land, it was said:

"His voluntary absence would not constitute an abandonment while the homestead continued to be occupied by the family." (p. 150.)

The court repeated what was said in *Morris v. Ward*, 5 Kan. 239:

"'The homestead was not intended for the play and sport of capricious husbands merely, nor can it be made liable for his weaknesses or misfortunes. It was not established for the benefit of the husband alone, but for the benefit of the family and of society—to protect the family from destitution, and society from the danger of her citizens becoming paupers.'" (p. 151.)

46—Kan.—1778

Also, from *Helm v. Helm,* 11 Kan. 19:

" 'The occupation and enjoyment of the estate is secured to her against any act of her husband or of creditors without her consent. If her husband abandons her, that use remains to her and the family. With or without her husband, the law has set this property apart as her home.' "   (p. 151.)

Again, from *Chambers v. Cox,* 23 Kan. 393:

" 'Neither is the presence of both husband and wife essential to the existence of a homestead.   Though one may have abandoned the other, yet either may have the children to care for and be the head of a family, and occupy a homestead.' "   (p. 152.)

When this case was here before (93 Kan. 72, 143 Pac. 430) it was pointed out that in the syllabus in *Withers v. Love,* supra, it was ruled that—

" 'So long as the wife is living nothing the husband alone can do or suffer to be done will estop either of them from claiming the homestead.' " (p. 78.)

But we are confronted with the finding that the husband had obtained another homestead in another state, and 21 Cyc. 606 is quoted:

"If the debtor acquires a new domicile or homestead, he thereby loses his homestead rights in the former place of residence."

Also, *Savings Bank v. Wheeler's Adm'r,* 20 Kan. 625:

"This is on the theory, that a man or the head of a family can have but one homestead at the same time."   (p. 630.)

The trouble about this argument is that it is not Eugene F. Thompson who is claiming a homestead right in this land, but the wife who remained there with her children and actually occupied it as a residence.   But it is said that in all his Oregon land proceedings Thompson said he was a single man, and that "divorces are too easily obtained to make it necessary for him to have sworn falsely."   It is urged that if his statements were true and he was a single man, then the plaintiff was no longer a married woman, and his signatures to the leases and deed were not necessary.   But competent proof of his divorce is not before us.   It is suggested that while an agent and the attorneys of the plaintiff found him and visited and talked with him, he was not produced, neither was his testimony taken.   It might also be observed that the plaintiff did not evince very much solicitude about learning his whereabouts from his relatives, who could have given her

information. The one clear fact remains, however, that during the time covered by the transactions involved herein this land was the actual homestead of the plaintiff and her children. It was never abandoned as in *Shay· v. Bevis,* 72 Kan. 208, 83 Pac. 202, and in most of the cases therein cited. A homestead cannot be alienated without the joint consent of husband and wife, while that relation exists, and that such relation has in this case ceased to exist has not been shown. Hence, so far as the homestead question is concerned there is nothing in the record to overturn the conclusion of the trial court in reference to the land in controversy.

It is forcibly argued that, the plaintiff· having been personally cognizant of all the investments made upon the strength of her conveyances, and familiar with all the operations thereunder, and having received her price for the instruments she executed, she is equitably estopped now to demand anything further by way of consideration for the oil produced as a result of her lease and deed. To this it is responded that there was no intent to mislead, and that the grantees in the instruments dealt with their eyes open, having inquired of the plaintiff, who told them frankly, about her husband's long absence. The claim that she was defrauded was not supported, and the trial court, as already indicated, found that all parties acted in good faith. They were left, therefore, in the attitude of buying and selling instruments which were void under the constitution and statute, and, being void, could convey no rights, and, having no rights, the oil was taken by the defendant wrongfully, or at least without legal compensation. (*Withers v. Love,* 72 Kan. 140, 83 Pac. 204.)

The trial court deemed it equitable, in view of the expenditures made and the cost of production, to allow the plaintiff but one-tenth of the value of the oil produced by Millikin, and under the circumstances it is held that this ruling constituted no error of which the defendant can complain.

The plaintiff has filed a cross appeal and complains that the expense of drilling the dry hole was counted in fixing the amount to be allowed the plaintiff, and of the refusal to make additional findings and to grant a new trial. We have examined the record, and find no error covered by the cross appeal of which the plaintiff can justly complain.

The judgment is affirmed.

WEST, J. (dissenting) : The plaintiff occupies the anomalous position of asking to recover for what she has already sold the defendant and been paid for. If she were presenting a question of homestead occupancy or right of possession, or even one for the cancellation of a lease or deed, the essential unfairness would not be so apparent. She voluntarily executed the conveyances, she received all she asked therefor, year after year she watched with full knowledge the investment of the defendant's capital on the strength of such conveyances, and, because the thing turned out more prosperously than was foreseen, she now seeks to make him pay her all the proceeds and has been given judgment for a portion thereof. When she executed the instruments she said, in effect and in equity, that, although they might be void in law, she would treat them as valid. During every day she watched the work she added to such agreement the weight of her acquiescence—a continuing reassurance to the defendant that she would keep her word.

Of course, the husband might return and sue, or she might die and the children sue, but, as for herself, the merest and commonest honesty should impel, as the courts should compel, her to keep faith.

Neither the doctrine of clean hands nor the decisions of this court hold out a reward under such circumstances. (*McAlpine v. Powell,* 44 Kan. 411, 24 Pac. 353; *Sellers v. Gay,* 53 Kan. 354, 36 Pac. 744; *Adams v. Gilbert,* 67 Kan. 273, 72 Pac. 769; and especially *Shay v. Bevis,* 72 Kan. 208, 83 Pac. 202.)

In the former opinion (93 Kan. 72, 77, 143 Pac. 430) it was said:

"Upon a full trial of the facts in this case it may develop that the plaintiff is estopped by her conduct."

That prophecy has, to my mind, become a reality.

DAWSON, J., dissents.