No. 78,883

WESLEY J. BITTEL, GENE W. BITTEL, and DAVID A. BITTEL, *Appellants*, v. FARM CREDIT SERVICES OF CENTRAL KANSAS, P.C.A., *Appellee*.

(962 P.2d 491)

Opinion filed July 10, 1998.

*Patrick Wiesner*, of Overland Park, argued the cause, and *William F. Schoeb*, of Overland Park, was with him on the brief for appellants.

*J. Randall Clinkscales*, Clinkscales and Brubaker, P.A., of Hays, argued the cause, and *Charlene Brubaker*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This case requires us to interpret the Credit Agreement Act (Act), K.S.A. 16-117 and K.S.A. 16-118, relating to liability upon oral credit agreements. Wesley Bittel and his two sons, Gene and David, sued Farm Credit Services of Central Kansas, P.C.A. (P.C.A.) for damages caused by the breach of an alleged oral agreement to renew a loan and for negligently representing that the loan would be renewed. P.C.A. refused to renew the Bittels' operating loan in September 1993, after the Bittels had planted a feed crop for their cattle operation, and the lack of financing prevented them from purchasing cattle to feed that winter. P.C.A. was awarded summary judgment based upon the provisions of the Act. The Bittels appeal.

*Factual statement*

The Bittels jointly operate a family farm and cattle feedlot in Ellis County, Kansas. They first began financing their operations through P.C.A. in 1971. Each year, the Bittels executed a new "Note and Loan Agreement" with P.C.A. in which the conditions for continued financing were set.

P.C.A.'s loan officers in Stockton, Kansas, Jeff Rich and Jim Adams, had authority to approve loans. Ron Nutsch was a P.C.A. branch manager and controlled prior approval of loans above the delegated lending authority of regional offices.

The Bittels began improving and expanding their feedlot operation in 1991. In September 1992, they executed a new Note and Loan Agreement in the amount of $1,621,886 plus interest. The

loan documents included a letter, separately signed by the Bittels and P.C.A., listing 13 special conditions of the loan. The critical condition to this case required the Bittels to maintain a chattel margin of no less than 20% as per the field report values.

Prior to executing the 1992 agreements, P.C.A. informed the Bittels by telephone that it had decided to renew the 1991 Note and Loan Agreement, which had been due on August 1, 1992. The Bittels had requested permission to purchase cattle, and Adams had verbally authorized the purchase, provided the cattle were hedged, after informing Gene that conditions would be placed on the loan approval. The cattle were then purchased prior to the execution of the 1992 agreement.

In March 1993, the Bittels requested an increase in the principal amount of their loan to cover additional operating expenses. P.C.A. approved the request, although the chattel margin was slightly under the required 20% margin. A new Note and Loan Agreement was executed in March 1993 for the amount of $2,195,523.17 plus interest and due upon September 1, 1993. The Bittels agreed 12 of the 13 special conditions of the September 1992 agreement would apply to the new agreement, including the 20% margin requirement. At the time of execution, the Bittels understood that P.C.A. had no obligation to renew the Note and Loan Agreement after the September 1, 1993, due date.

Adams and Rich met with the Bittels on their farm on June 10, 1993, to discuss compliance with the chattel margin requirement and continued financing of the operation. The Bittels expressed dissatisfaction with P.C.A.'s method of valuing their cattle and calculating their chattel margin. The meeting also included a conversation regarding whether the Bittels would plant milo to be harvested for sale or feed for silage on their farmland. If milo was planted, the Bittels would have a cash crop to sell. If feed for silage was planted, the Bittels would have to feed the silage to cattle. The Bittels wanted assurance they would receive continued financing in the fall to purchase cattle for their feedlot if they planted feed to be ensiled.

In his deposition, Wesley Bittel testified that Gene asked the loan officers, " 'Will there be continued financing for our feeding

operation?' " and one of the officers replied, " 'We see no problem as long as margins can be met.' " Gene testified in his deposition that he asked the loan officers whether they should plant milo or feed for silage. Rich responded, " 'We're not in the business of making management decisions.' " Gene told Rich, " 'I need to make a management decision, are we going to have financing this fall?' " Rich said, " 'We see no problem. Go ahead.' " Gene testified that they then discussed the conditions and collateral which would be required for renewal, including a possible lien on Wesley's unencumbered land or a $90,000 cash infusion. Gene also agreed with his interrogatory answer which indicated that Rich had told him, " 'We see no problem with the feedlot except we might need a cash infusion or more collateral.' " The Bittels began planting feed for silage the next day.

Rich met with Nutsch in Wichita to discuss the Bittels' operation and the June 10 meeting with the Bittels. On June 24, 1993, Nutsch sent a memo to Rich and Adams expressing concerns about the operation and indicating that the planting decision was up to the Bittels, but that due to the low chattel margin and 2 consecutive years of losses, P.C.A. could not make a blanket statement that it was a lender who could stick with the Bittels.

Two days later, Adams sent a letter to the Bittels advising them of P.C.A.'s concern with their low chattel margin and the likely need for a cash infusion or additional collateral. The letter stated that in regards to continued financing, significant progress needed to be made and that drafting privileges under the current agreement were dependent upon continued compliance with its conditions.

Adams again met with the Bittels on August 10, 1993, to conduct a field inspection. Afterwards, Adams calculated the chattel margin at 16% and called Wesley to inform him their drafting privileges were about to be suspended. Adams sent a letter on August 13, 1993, advising the Bittels that their drafting privileges had been suspended, stating that their loan renewal application had been denied, and enclosing an adverse credit action notice.

The Bittels were unable to purchase cattle to feed that year, although the feed for silage harvested that fall was eventually fed

to cattle during the following winter. The Bittels continued to have discussions through December 1993 with P.C.A. regarding renewed financing, but P.C.A. rejected Wesley's proposed plan. P.C.A.'s restructure proposal was subsequently rejected by the Bittels as "completely unacceptable." The Bittels then found another lender and paid off their indebtedness to P.C.A.

The Bittels filed suit against P.C.A., and their second amended petition alleged P.C.A. breached an oral contract to renew their financing and that P.C.A. representatives negligently misrepresented that their loan would be renewed. In its defense, P.C.A. relied upon K.S.A. 16-118, which bars enforcement of an oral credit agreement. P.C.A. also asserted the Bittels did not reasonably rely upon P.C.A.'s alleged promise to renew the loan and its loan officers had not made any negligent misrepresentations.

The trial court granted P.C.A.'s motion for summary judgment. The court held K.S.A. 16-118 barred the Bittels' claim that an oral contract to renew the loan was created on June 10, 1993. The court also found the action was essentially a contract action and the Bittels could not avoid dismissal by alleging the commission of a tort. In addition, the court ruled that statements by Adams and Rich on June 10, 1993, were not an unequivocal promise to renew a loan; thus, the Bittels had no right to rely upon such statements.

The Bittels appeal pursuant to K.S.A. 60-2102(a)(4). The case was transferred to us under K.S.A. 20-3018(c).

*Oral agreement*

The Bittels first argue that the March 1993 Note and Loan Agreement is only a promissory note and, as such, it could be modified by oral agreement in June 1993. The trial court ruled:

"Assuming for the sake of argument that the 3/10/93 instrument was a promissory note, the alleged agreement of June 10, 1993 was not. It was an agreement to extend credit in the future or to delay repayment of an existing indebtedness. . . .

"Also, the court finds that the additional terms and conditions of the Note and Loan Agreement of 3/10/93 make it something other than a promissory note. Both creditor and debtor were required to sign this instrument to make it effective. A promissory note must be signed only by the debtor."

The Bittels' argument is controlled by the provisions of the Act. Our fundamental rule of statutory construction is that the intent

of the legislature, where it can be ascertained, governs the construction of a statute. See *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993). "The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. . . . See *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs*, 247 Kan. 625, 633, 802 P.2d 1231 (1990)." *Marais des Cygnes Valley Teachers' Ass'n v. U.S.D. No. 456*, 264 Kan. 247, 250, 954 P.2d 1096 (1998). Appellate courts will not speculate as to the legislative intent of a plain and unambiguous statute. *State v. Lawson*, 261 Kan. 964, 966, 933 P.2d 684 (1997).

K.S.A. 16-118 provides:

"(a) A debtor or a creditor may not maintain an action on a credit agreement unless the agreement is in writing and is signed by the creditor and the debtor.

"(b) All credit agreements shall contain a clear, conspicuous and printed notice to the debtor that states that the written credit agreement is a final expression of the credit agreement between the creditor and debtor and such written credit agreement may not be contradicted by evidence of any prior oral credit agreement or of a contemporaneous oral credit agreement between the creditor and debtor. A written credit agreement shall contain a sufficient space for the placement of nonstandard terms, including the reduction to writing of a previous oral credit agreement and an affirmation, signed or initialed by the debtor and the creditor, that no unwritten oral credit agreement between the parties exists."

"Credit agreement" is defined in K.S.A. 16-117:

"(a) 'Credit agreement' means an agreement by a financial institution to lend or delay repayment of money, goods or things in action, to otherwise extend credit or to make any other financial accommodation. For purposes of this act the term 'credit agreement' does not include the following agreements: Promissory notes, real estate mortgages, security agreements, guaranty agreements, letters of credit, agreements in connection with student loans insured or guaranteed pursuant to the federal higher education act of 1965 and acts amendatory thereof and supplementary thereto, and agreements in connection with 'lender credit cards' as defined in the uniform consumer credit code."

K.S.A. 16-117 and K.S.A. 16-118 were enacted in 1988 and amended the following year. The amendment added the second sentence of K.S.A. 16-117(a), clarifying that promissory notes, guaranty agreements, letters of credit, student loan agreements, and lender credit cards do not fall within the purview of the statute.

K.S.A. 16-119 was also newly enacted to state: "This act is a declaration of the meaning of chapter 55 of the laws of 1988, as originally adopted." L. 1989, ch. 70, §§ 1, 2.

The Act has only been addressed thus far in one appellate case, *Wells v. State Bank of Kingman*, 24 Kan. App. 2d 394, 395, 945 P.2d 418 (1997), where the Court of Appeals noted:

"The statutes were enacted in 1988 in an apparent attempt to limit 'lender liability' claims based on alleged oral agreements between borrowers and financial institutions. K.S.A. 16-118(a) essentially operates as a statute of frauds. See Calvert, *Kansas Legislation Governing Credit Agreements of Financial Institutions*, 59 J.K.B.A. 19, 21 (Feb./March 1990).

"While our appellate courts have yet to interpret these statutes, this application seems straightforward enough to us. And in the present case, the parties do not dispute that K.S.A. 16-118(a) applies."

The Act was also discussed in Rossi, *Lender Liability in Kansas: A Paradigm of Competing Tort and Contract Theories*, 29 Washburn L. J. 495, 513-16 (1990). The author stated:

"[T]he Kansas legislature recently passed, and quickly amended, a statute providing that no action may be maintained on a credit agreement unless it is in writing and signed by both the debtor and creditor, in effect subjecting credit agreements to a rule analogous to the statute of frauds. . . .

"The initial law was troublesome in that the definition of credit agreement was broad enough to include such agreements as promissory notes, mortgages, security agreements and other agreements which are usually signed only by the debtor. This problem raised concerns about the enforceability of such agreements and merited the prompt issuance of an Attorney General Opinion attempting to clarify the matter. The law has been amended to respond to this problem by excluding promissory notes, mortgages, security agreements and other specified agreements from the definition of credit agreement. . . .

. . . .

"[T]he operative provision of the statute is section 16-118(a) which provides that an action may not be maintained on a credit agreement unless it is in writing and signed by the debtor and creditor. As noted, this is a statute of frauds applicable to the defined class of credit agreements. Since the statutory definition of credit agreement is broad enough to include amendments, modifications and waivers relating to a credit agreement, a proper reading of section 16-118(a) as a statute of frauds should prohibit actions on all alleged oral amendments, modifications and waivers relating to a written credit agreement."

The legislative history of the Act makes clear the intent of the legislature to bar actions on oral credit agreements such as the one

in the present case. The Minutes of the House Committee on Commercial and Financial Institutions, March 17, 1988, stated:

"S.B. 535 would require that to be judiciously enforceable by a debtor the credit agreement must be in writing and signed by the party to be charged. The Bill would create a statute of frauds for this type of agreement in that the terms of the written agreement may not be varied by evidence of prior agreements, either written or oral or by contemporaneous oral agreements."

The Supplemental Note on S.B. 535 reads: "The intent of the bill is to insure there is written evidence of credit agreements and to prevent lawsuits based on disputed oral agreements to lend money or the disputed terms for lending the money."

Furthermore, there is evidence in the legislative record that the 1989 amendment was intended to make clear that lenders would not be required to sign documents, such as promissory notes, which traditionally only required the signature of the debtor to make such agreements enforceable. The Minutes of the Senate Committee on Financial Institutions and Insurance, January 26, 1989, reported:

"Jim Maag, Kansas Bankers Association, . . . stated that amendments to SB 535, passed during the 1988 legislative session, were necessary because of the increasing number of lawsuits based on oral agreements. . . . SB 46 provides that the debtor or creditor cannot maintain action on a credit agreement unless two conditions are present, (1) it must be in writing and (2) it must be signed by both parties. Exceptions to this would be student loans and lender credit card agreements as it is almost impossible to meet the requirements of credit agreements in these two types of transactions."

The Kansas Bankers Association, in a letter to the Senate Committee on Financial Institutions and Insurance, January 26, 1989, stated that the Act, prior to the 1989 amendment,

"has raised the question among bank legal counsels as to which documents used by the bank are considered 'credit agreements' and which ones are not. . . .

"[I]t is important that banks and S&Ls be assured as soon as possible which documents must be changed and which ones may be retained to comply with the provisions of the act."

A promissory note whereby a borrower promises in writing to pay an indebtedness cannot be subsequently amended to require the creditor to assume additional duties under the note. Such an amendment would change the nature of a note, particularly as

notes only require the signature of the debtor to be enforceable. Therefore, an oral promise on the part of a lender to extend credit in the future may not be considered a modification of a debtor's promissory note and falls within the clear definition of "credit agreement" in K.S.A. 16-117(a). As such, K.S.A. 16-118(a) plainly requires such an agreement to be in writing and signed by both the creditor and debtor.

The trial court correctly determined that even if the March 1993 Note and Loan Agreement were considered only a promissory note, this would have no bearing upon the alleged June 1993 agreement to renew the Bittels' financing in September. We need not consider whether the March 1993 Note and Loan Agreement was only a promissory note because the June 1993 agreement could not be a mere modification of such a note. The Bittels' assertions to the contrary have no merit.

The legislature has acted to bar actions on oral credit agreements, which is exactly what the Bittels are seeking to enforce. The legislature's intent is clear. The Bittels' action to enforce the alleged oral agreement of June 10, 1993, may not be maintained. The trial court correctly granted summary judgment on this issue.

*Tort theories of recovery*

The trial court ruled the Bittels could not seek to recover under both theories of contract and tort because the essence of their action sounded in contract. The court used this determination to rule out the Bittels' claims for promissory estoppel and negligent misrepresentation. P.C.A. asserts that the Act clearly was intended to rule out actions based upon such theories.

As will later be discussed, Kansas law permits the doctrine of promissory estoppel to overcome a statute of frauds defense under certain factual situations. P.C.A.'s argument that the Act was intended to bar such actions is not consistent with Kansas law to the contrary and is refuted by the legislative record. In a letter included in the legislative record, an attorney suggested that language should be inserted into the proposed Act to legislatively overrule the doctrines of part performance and estoppel. Minutes of House Committee on Commercial and Financial Institutions, March 17, 1988.

Despite having its attention drawn to this matter, the legislature never incorporated language in the Act to eliminate recovery under a theory of promissory estoppel. Thus, we find there was no intent to legislatively overrule the doctrine long established by our case law.

We next address P.C.A.'s assertion that the Bittels may not maintain a negligence action in a breach of contract case. The trial court relied on *Beeson v. Erickson,* 22 Kan. App. 2d 452, 917 P.2d 901 (1996), in reaching its conclusion that "the law of this state will not allow a tort action to be maintained in what is essentially a contract action." The court held: "It is clear from the history of this case that the tort action is being pursued in an effort to avoid the dismissal which would result from maintenance of a contract action under K.S.A. 16-118."

It is not necessary for our decision to analyze the differences between cases with competing tort and contract theories, but see Rossi, 29 Washburn L. J. 495, previously cited herein.

In our recent case of *Gerhardt v. Harris,* 261 Kan. 1007, 1018, 934 P.2d 976 (1997), we reversed a grant of summary judgment in favor of the defendant on theories of both fraud and breach of oral contract based upon essentially the same conduct. This case demonstrates that when the same conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies.

This is true in situations such as the present case, where a plaintiff is unable to recover under a breach of contract theory because an enforceable contract was never made. In such situations, a theory of fraud or promissory estoppel may be the plaintiff's only possible remedy, and Kansas has traditionally recognized and permitted such causes of action. The trial court's reliance upon *Beeson,* 22 Kan. App. 2d 452, to categorically reject the Bittels' tort claims from what it considered a contract action, including claims of promissory estoppel and negligent misrepresentation, was misplaced.

*Promissory estoppel*

The Bittels assert that even if K.S.A. 16-118 would ordinarily operate to bar their action on the alleged oral agreement to renew

their financing, the doctrine of promissory estoppel should allow them to recover due to their reliance upon P.C.A.'s promise. The Bittels claim they incurred damages by deciding to plant feed for silage rather than milo after relying upon statements made by P.C.A. loan officers that there would be no problem with renewing the operating loan.

P.C.A. argues that the Bittels cannot establish they rightfully or reasonably relied upon the statements of its loan officers such that recovery under a theory of promissory estoppel should be permitted. P.C.A. also points out that the essential terms and conditions of any such agreement were not established on June 10, 1993.

In *Decatur Cooperative Association v. Urban*, 219 Kan. 171, Syl. ¶¶ 5, 6, 7, 547 P.2d 323 (1976), in discussing the application of promissory estoppel, we said:

"The doctrine of promissory estoppel may render enforceable any promise upon which the promisor intended, or should have known, that the promisee would act to his detriment, and which is indeed acted upon in such a manner by the promisee, where application of the statute of frauds to that promise would thus work a fraud or gross injustice upon the promisee."

"Before the doctrine of promissory estoppel can be invoked in a case involving the statute of frauds the promisee must first show by competent evidence that a valid and otherwise enforceable contract was entered into by the parties."

"In order for the doctrine of promissory estoppel to be invoked the evidence must show that the promise was made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise. Furthermore promissory estoppel should be applied only if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice."

The Court of Appeals in *Wells* discussed the application of promissory estoppel to a claim based on an oral credit agreement otherwise barred by K.S.A. 16-118. The court stated:

"Wells contends his partial performance of the agreement between him and FmHA removes the case from the statute's operation.

"Before partial performance can be invoked to escape the operation of the statute of frauds, the contract must be fully made in every respect, except for an actual writing. See *Owasso Dev. Co. v. Associated Wholesale Grocers, Inc.*, 19 Kan. App. 2d 549, 873 P.2d 212, *rev. denied*, 255 Kan. 1003 (1994). Here, the trial court found the terms and conditions of any contract between Wells and the

Bank were never fixed. Further, the trial court found that Wells did not come into court with clean hands, in that he violated his plan with FmHA in several respects.

. . . .

"We note the Kansas Bankers Association's argument in its *amicus* brief is technically correct that the partial performance doctrine applies only to contracts involving land. But Wells' theory may as easily be labeled one of promissory estoppel, which is not limited to contracts involving land. See *Decatur Cooperative Association v. Urban*, 219 Kan. 171, 547 P.2d 323 (1976)." 24 Kan. App. 2d at 395-96.

In *First Bank of WaKeeney v. Moden*, 235 Kan. 260, 264-65, 681 P.2d 11 (1984), we declared:

"The mere fact that a bank has renewed loans in the past does not require it to do so in the future.

"A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show that it rightly relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. *Iola State Bank v. Biggs*, 233 Kan. 450, Syl. ¶ 4, 662 P.2d 563 (1983). There is no evidence in this case that the Bank, by its actions, induced the Modens to reasonably believe that they would get an extension of their loan, regardless of their ability to pay their obligations, if they complied with the farm plan and Loan Agreement. As the trial court observed, 'Promissory estoppel involves both misrepresentation and detrimental reliance.' Neither is present here."

The trial court did not address P.C.A.'s argument that the Bittels could not have reasonably relied upon the alleged promises of its loan officers but did rule: "[T]he plaintiffs make the assumption in their argument that the existing agreement would be renewed or extended under existing terms and conditions, an assumption not warranted in this case."

The Bittels present a detailed history of their debtor/creditor relationship with P.C.A. in an attempt to establish they had frequently obtained oral commitments for credit and oral authorization to modify their loan budget. However, these examples all generally fall within the category of a change in the application purpose of funds previously authorized to be loaned. They are not oral authorizations to exceed the loan budget or for any type of guaranteed renewal.

In order to recover on a theory of promissory estoppel, the Bittels must establish that they entered into an otherwise valid and enforceable contract with P.C.A. in June 1993 to renew their financing. They also must prove that P.C.A. should have known that the Bittels would rely upon this agreement and that the Bittels did reasonably rely upon P.C.A.'s promise.

The trial court clearly determined that no valid or enforceable contract was entered into in June 1993 because the terms and conditions of the contract had not been established. The Bittels had argued that the same terms that had been included in their prior Note and Loan Agreement would have been incorporated into the new loan agreement. The trial court correctly pointed out that this is an unwarranted assumption.

Even if the interest rate and amount of the loan could be assumed from prior transactions, the conditions of the financing could not, as evidenced by the very negotiations pertaining to the necessity of granting additional collateral or making a cash infusion that occurred at the time of and subsequent to the alleged promise was made on June 10, 1993. The parties had clearly not agreed upon the additional conditions for loan renewal when the statements were made by P.C.A.'s loan officers that they saw no problem with renewing the Bittels' financing so long as the chattel margins continued to be met.

In addition, the Bittels' reliance upon the loan officers' statements is unreasonable because both Gene's and Wesley's account of the June 10, 1993, conversation recognized that continued financing was dependent upon complying with the loan conditions, including the chattel margin requirement. It was unreasonable to assume that financing would be available regardless of whether these conditions were met.

Furthermore, a refusal to enforce the alleged June 10, 1993, agreement under these facts does not amount to a sanctioning of fraud or other injustice. The Bittels were aware of the chattel margin requirement for continued financing, apparently had it within their power to fulfill this requirement, and did not do so. Although the circumstances surrounding the nonrenewal of the Bittels' fi-

nancing were certainly unfortunate, they do not ring of fraud or deceit.

The Bittels are not entitled to relief under a theory of promissory estoppel.

### Negligent misrepresentation

We first adopted the tort of negligent misrepresentation as defined in Restatement (Second) of Torts § 552 (1976) in *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 605, 876 P.2d 609 (1994). In *Gerhardt v. Harris*, 261 Kan. 1007, 1018, 934 P.2d 976 (1997), we discussed the applicability of this tort and stated: "The comments to § 552 show that negligent misrepresentation applies to suppliers of commercial information in favor of users of such information in their commercial transactions." We later added: "Generally, § 552 includes negligent supply of commercial information to others for guidance in their business transactions." 261 Kan. at 1019.

We found Gerhardt could not recover for her former attorney's alleged negligent misrepresentation that he would abide by the decision of an arbitration committee. We noted:

"The danger in allowing Gerhardt to proceed with her negligent misrepresentation claim is that any breach of contract action could be treated as also including a negligent misrepresentation claim. Endorsing Gerhardt's analysis would encourage an overly expansive reading of § 552." 261 Kan. at 1021.

In *Gerhardt*, we quoted from *City of Warrensburg, Mo. v. RCA Corp.*, 571 F. Supp. 743 (W.D. Mo. 1983), which distinguished negligent misrepresentation from a misrepresentation to perform an agreement. The *RCA* court set forth the comment to § 530, which said in part: "'If the agreement is not enforceable as a contract, as when it is without consideration, the recipient still has, as his only remedy, the action in deceit under the rule stated in § 525 [Liability for Fraudulent Misrepresentation].'" 571 F. Supp. at 753. The *RCA* court went on to state:

"Unlike § 530, § 552 does not, by its terms, apply to misrepresentation of intention to perform an agreement. Nor do the illustrations to § 552 apply to other than typical cases of misrepresentation of factual, commercial information. The Comments to § 530 specifically state that where there is no viable action on the

contract, the exclusive remedy for misrepresentation of intention to perform an agreement lies in the action for deceit. . . . A merely negligent misrepresentation of a maker's own intention is not actionable under § 530 for the reason that in the absence of any fraudulent intent . . . there is no misrepresentation of any existing fact on which any action for negligent misrepresentation could be based." 571 F. Supp. at 753.

The trial court in the present case held that even if it were to permit a claim for negligent misrepresentation, such a misrepresentation must be an affirmative statement of fact upon which the Bittels had a right to rely. The court found that the representation alleged by the Bittels was one of opinion and not of fact and was far from an unequivocal promise to renew the credit agreement.

The Bittels assert that in making this determination, the trial court failed to properly apply the summary judgment standard of viewing the facts in the light most favorable to them. However, the question of whether the alleged misrepresentations were of ones of present fact or ones of opinion or future intent is clearly a question of law.

Here, the statements as to whether P.C.A. would continue financing the Bittels' farm operation pertained to an intent to perform in the future. The loan officers' statements were either true or deliberately false. If the latter, the misrepresentation would have been intentional, not negligent. Regardless, and most importantly, these statements were clearly conditional upon future compliance with loan requirements, which could not be ascertained at the time the statements were made.

The statements made by the loan officers upon which the Bittels claim to have relied are not the type of misrepresentation contemplated by § 552 of the Restatement and are not recoverable under a negligent misrepresentation theory. The trial court correctly determined that the Bittels could not sustain an action for negligent misrepresentation.

The trial court's grant of summary judgment is affirmed.