**FIREWORKS SPECTACULAR, INC.
and Piedmont Display Fireworks,
Inc., Plaintiffs,**

v.

**PREMIER PYROTECHNICS, INC. and
Matthew P. Sutcliffe, Defendants.**

No. Civ.A. 99–2240–GTV.

United States District Court,
D. Kansas.

Feb. 23, 2000.

Dennis M. Clyde, Clyde & Wood, L.L.C., Overland Park, KS, for Fireworks Spectacular, Inc., Piedmont Display Fireworks, Inc., plaintiffs.

Robert S. Tomassi, Loy & Tomassi, P.A., Pittsburg, KS, for Matthew P Sutcliffe, defendant.

### MEMORANDUM AND ORDER

VanBEBBER, Chief Judge.

Plaintiffs filed this diversity action against defendants alleging misappropria-

tion of trade secrets, breach of employment agreement, and breach of fiduciary duty. The case is before the court on plaintiffs' motion for preliminary injunction (Doc. 22). Plaintiffs seek to enjoin defendants from further misappropriating their trade secrets and further soliciting or selling to their customers.

After carefully considering the arguments of counsel, as well as the testimony of witnesses, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. Findings of Fact

Plaintiff Fireworks Spectacular, Inc. ("Fireworks Spectacular") is a Kansas corporation with its principal place of business in Pittsburg, Kansas. Plaintiff Piedmont Display Fireworks, Inc. ("Piedmont") is also a Kansas corporation with its principal place of business in Pittsburg, Kansas. Defendant Matthew P. Sutcliffe is a resident of Missouri. Defendant Premier Pyrotechnics, Inc. ("Premier Pyrotechnics") is a Missouri corporation with its principal place of business in Dixon, Missouri.

Plaintiffs are engaged in the business of selling fireworks. Fireworks Spectacular sells fireworks for retail and conducts firework displays or shows for customers. Piedmont sells fireworks for wholesale to distributors and to persons who want to shoot their own firework shows. Fireworks Spectacular and Piedmont have common ownership, officers, and directors. For all practical purposes, they are treated as one and the same by both plaintiffs and defendants.

Plaintiffs employed Mr. Sutcliffe part-time beginning in 1996 as a commissioned salesperson responsible for selling shows. On March 2, 1997, Mr. Sutcliffe began working as a full-time employee; he continued serving as a salesperson, but also served as the general manager for both Fireworks Spectacular and Piedmont.

In June 1997, plaintiffs directed their attorney to prepare a written employment agreement to be entered into between Fireworks Spectacular and Mr. Sutcliffe. The agreement included, among other things, a covenant not to compete which provides the following:

[Mr. Sutcliffe] warrants and agrees that during the term of this agreement or any renewal thereof and for a period of five (5) years after the date of the termination or nonrenewal of this agreement, [Mr. Sutcliffe] will not:

A. Compete with [Fireworks Spectacular] in any manner or establish, open, be engaged in, or in any manner whatsoever become interested, directly or indirectly, as employee, owner, partner, agent, stockholder, director, officer or otherwise, in any business, trade or occupation which competes with the business of [Fireworks Spectacular] within the area hereinafter set forth.

B. Solicit, market, promote or attempt to sell products or services to any [Fireworks Spectacular] customer, dealer or retailer for any products or services other than those which are purchased from [Fireworks Spectacular], and will not introduce any [Fireworks Spectacular] customer, dealer or retailer to any competing products or solicit, request or encourage any [Fireworks Spectacular] customer, dealer or retailer to buy, sell, market or handle any products other than those specifically sold to such person or party by [Fireworks Spectacular].

C. After termination or expiration of this agreement, solicit [Fireworks Spectacular] customers, dealers and retailers or sell any goods or services to them and shall not engage in competition with [Fireworks Spectacular] in any manner whatsoever.[1]

1. The agreement also states that "the agreement not to compete ... shall be effective within the states of Kansas, Missouri, Oklahoma and Arkansas."

The agreement was presented to Mr. Sutcliffe and, although it was the subject of employment negotiations, it was never actually signed by Mr. Sutcliffe. Irrespective of his failure to sign, however, Mr. Sutcliffe agreed to sign the agreement; knew that his continued employment was conditioned upon his signing the agreement; and continued to work for plaintiffs without objection. Moreover, Mr. Sutcliffe agreed to sign the same noncompetition agreement with respect to both Fireworks Spectacular and Piedmont.

In the fireworks industry, the identity of potential customers is not information which is readily available to the public. There is no known source from which one can ascertain the identity of persons who display fireworks or who may be interested in purchasing fireworks; instead, the most common and useful way to acquire customers is through "cold-calling," an often lengthy and costly process.

Over the past several years, plaintiffs have compiled computerized customer lists for both Fireworks Spectacular and Piedmont. In addition, Mr. Sutcliffe made notes in a personal logbook concerning the specifics of customers with whom he came into contact and sales that he made. The computerized lists and Mr. Sutcliffe's logbook (collectively referred to as plaintiffs' "customer lists") include some or all of the following information with regard to each customer: the name, address, and phone number of the customer; the "contact person"; the amount of money previously spent; a sight survey concerning the size of explosives that can be shot in the customer's area; and general notes concerning anything that could be done to improve the customer's show in the future.

In 1998, Mr. Sutcliffe left his employment with plaintiffs to start his own fireworks business, defendant Premier Pyrotechnics. Mr. Sutcliffe started Premier Pyrotechnics with the intention of taking customers from and competing directly with plaintiffs. Premier Pyrotechnics is now in direct competition with plaintiffs and services several of plaintiffs' former customers.

## II. Conclusions of Law

■ A preliminary injunction is an extraordinary remedy that is granted as the exception rather than the rule. *See Buca, Inc. v. Gambucci's, Inc.,* 18 F.Supp.2d 1193, 1200 (D.Kan.1998) (citing *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984)). "The main purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits in order for the trial court to render a meaningful decision." *Id.* at 1200–01 (citing *Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1198 (10th Cir.1992)). The determination whether to grant a preliminary injunction rests within the sound discretion of the trial court. *See United States v. Power Eng'g Co.,* 191 F.3d 1224, 1230 (10th Cir.1999) (reviewing the grant of a preliminary injunction for abuse of discretion). To prevail, plaintiffs must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) the threatened harm outweighs the injury that an injunction may impose upon the opposing party; and (4) an injunction is not adverse to the public interest. *See Kansas Health Care Assoc., Inc. v. Kansas Dep't of Soc. & Rehab. Servs.,* 31 F.3d 1536, 1542 (10th Cir.1994).

The Tenth Circuit has adopted a modified interpretation of the "likelihood of success" requirement. If the other requirements for a preliminary injunction are satisfied, the movant can establish the "likelihood of success" requirement merely by showing "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation." *Buca,* 18 F.Supp.2d at 1201 (citing *City of Chanute v. Kansas Gas & Elec. Co.,* 754 F.2d 310 (10th Cir. 1985) and *Otero Sav. & Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275 (10th Cir.1981)).

### A. Trade Secrets

Plaintiffs' trade secret claim is brought under the Uniform Trade Secrets Act, K.S.A. § 60–3320 *et seq.* (1994).[2] According to that statute, "trade secret" means information "including a formula, pattern, compilation, program, device, method, technique, or process" that "(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." § 60–3320(4).

The primary "trade secret" at issue in this case is plaintiffs' customer lists, which include some or all of the following information with regard to each customer: the name, address, and phone number of the customer; the "contact person"; the amount of money previously spent; a sight survey concerning the size of explosives that can be shot in the customer's area; and general notes concerning anything that could be done to improve the customer's show in the future. Defendants argue that the customer lists do not constitute a "trade secret" because they solely contain information that is either generally known or readily ascertainable through independent investigation.

█ The existence of a trade secret under the Uniform Trade Secrets Act is a question of fact for determination by the trier of fact. *See All West Pet Supply Co. v. Hill's Pet Prod. Div., Colgate–Palmolive Co.,* 840 F.Supp. 1433, 1437 (D.Kan.1993). "Customer lists and other customer information may constitute a trade secret." *Id.* at 1438; *see also Curtis 1000, Inc. v. Pierce,* 905 F.Supp. 898 (D.Kan.1995). Customer lists containing merely public information that could be easily compiled by third parties will not be protected as

trade secrets; however, where "the party compiling the customer lists, while using public information as a source, ... expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection." *Robert B. Vance & Assocs., Inc. v. Baronet Corp.,* 487 F.Supp. 790, 799 (N.D.Ga.1979).

█ The court concludes that plaintiffs have shown a substantial likelihood of success on the merits with respect to their trade secrets claim. Neither party disputes the great amount of time, effort, and energy that it takes to put together the type of customer lists that plaintiffs have compiled. In fact, plaintiffs contend that the lists were compiled over many years and thousands of hours. Moreover, the evidence shows that the customer lists give plaintiffs a competitive advantage in the fireworks industry. Mr. Sutcliffe admits that the customer lists allowed him to immediately solicit customers and engage in competition with plaintiffs without first having to compile a data list of his own, and that he would likely have lost money during the first year without the customer lists. Moreover, Mr. Sutcliffe knew it was the policy of plaintiffs to keep the customer lists secret, and that he was expected to protect them from disclosure.

█ Mr. Sutcliffe argues that the personal logbook which he kept while working for plaintiffs is not a trade secret, because he was solely responsible for assembling it and because it only contains information concerning sales that he made. The court concludes, however, that such logbook, even if prepared by Mr. Sutcliffe, is the property of the employer. *See Morrison v. Woodbury,* 105 Kan. 617, 185 P. 735, 737 (1919) (citing *Empire Steam Laundry v. Lozier,* 165 Cal. 95, 130 P. 1180 (1913),

---

**2.** It is also brought "pursuant to the *Restatement of Torts* § 757 and based upon their common law right to protection from the misappropriation of trade secrets and unfair competition." K.S.A. § 60–3326, however, states that the Uniform Trade Secrets Act "displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret."

which held that a customer list, even though in part prepared by the defendant, was the absolute property of the plaintiff and deserving of trade secret protection).

 In addition to showing a substantial likelihood of success on the merits, plaintiffs have successfully shown that, if defendants are not enjoined from misappropriating their trade secret, they will likely suffer irreparable harm. Defendants are engaging in behavior that is likely to result in plaintiffs' further loss of customers as well as customer goodwill. The court determines that such activity is causing irreparable harm because of the "extreme difficulty and uncertainty in restoring goodwill among the customers and regaining the business of customers who are being, and will be, induced away or lost by [plaintiffs]." *Inter-Collegiate Press, Inc. v. Myers,* 519 F.Supp. 765, 770 (D.Kan.1981). Furthermore, the court concludes that any harm the injunction may cause to defendants is outweighed by the injury that a failure to impose the injunction may cause to plaintiffs. Defendants will not be prohibited from engaging in the fireworks industry altogether; they will merely be prohibited from doing so with the unauthorized use of plaintiffs' customer lists. Finally, the court concludes that the public has an interest in protecting valid trade secrets and preventing unfair competition.

### B. Covenant Not to Compete

Plaintiffs contend that Mr. Sutcliffe violated the terms of a covenant not to compete to which he orally agreed. It is undisputed that, although the alleged agreement was in writing, Mr. Sutcliffe never signed it. The Kansas Statute of Frauds, K.S.A. § 33–106 (1993), requires an agreement to be in writing if it "is not to be performed within the space of one year from the making thereof." The alleged oral agreement in this case provides that Mr. Sutcliffe will not compete with plaintiffs for a period of five years after the date of the termination or non-renewal of the agreement. Thus, absent some justification, plaintiffs' claim to en-

force the agreement is barred by the statute of frauds.

 Kansas law permits the doctrine of promissory estoppel to overcome a statute of frauds defense under certain factual situations. *See Bittel v. Farm Credit Servs. of Central Kansas, P.C.A.,* 265 Kan. 651, 962 P.2d 491, 497 (1998). In *Decatur Co-op. Assoc. v. Urban,* 219 Kan. 171, 547 P.2d 323, 329–30 (1976), the Kansas Supreme Court stated:

[T]he doctrine of promissory estoppel may render enforceable any promise upon which the promisor intended, or should have known, that the promisee would act to his detriment, and which is indeed acted upon in such a manner by the promisee, where application of the statute of frauds to that promise would thus work a fraud or a gross injustice upon the promisee. (Citation omitted.) Before the doctrine of promissory estoppel can be invoked in a case involving the statute of frauds the promisee must first show by competent evidence that a valid and otherwise enforceable contract was entered into by the parties. (Citation omitted.)

In order for the doctrine of promissory estoppel to be invoked the evidence must show that the· promise was made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise. Furthermore, promissory estoppel should be applied only if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice. (Citation and internal quotations omitted.)

Plaintiffs argue that they "justifiably relied upon [Mr. Sutcliffe's] promise not to compete and to sign the written employment agreement," and that "in return for [Mr. Sutcliffe's] bargain for continued employment and increased compensation, [plaintiffs] specifically required [Mr. Sutcliffe] to agree to a non-competition clause and sign the written employment con-

tract." Plaintiffs further argue that they "fully performed the agreement reached with [Mr. Sutcliffe] by increasing his compensation and paying him based upon the bargain between the parties which included the agreement not to compete."

▇▇▇ The court finds that, even though Mr. Sutcliffe ultimately failed to sign the agreement, he agreed to sign the agreement; he knew that his continued employment was conditioned upon his signing the agreement; and he continued to work for plaintiffs without objection. Furthermore, the court finds that plaintiffs relied to their detriment on Mr. Sutcliffe's promise to sign the agreement. While the court is not completely convinced that plaintiffs' reliance on Mr. Sutcliffe's promise was reasonable, it believes that plaintiffs have met the Tenth Circuit's modified interpretation of the "likelihood of success" requirement. The court believes that plaintiffs have successfully shown "questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation." *See Buca*, 18 F.Supp.2d at 1201 (citing *City of Chanute*, 754 F.2d 310 and *Otero Sav. & Loan Ass'n*, 665 F.2d 275).

Moreover, the court believes that if plaintiffs ultimately prevail on a theory of promissory estoppel, the covenant would be enforceable to the extent that it protects any legitimate business interest beyond mere competition. *See Eastern Distrib. Co., Inc. v. Flynn*, 222 Kan. 666, 567 P.2d 1371 (1977) (holding that the restraint of a covenant not to compete must be reasonable under the facts and circumstances of the particular case, and that only a legitimate business interest may be protected by the covenant). The court

concludes from the record before it that the legitimate business interest to be protected in this case is plaintiff's customer contacts.

▇▇▇ "Customer contacts" is a legitimate interest to be protected by a covenant not to compete where the employee's relationship with the employer's customers is such that there is a substantial risk that the employee may be able to divert all or part of the employer's business. *See Eastern Distrib.*, 567 P.2d at 1376–77 (quoting Professor Harland M. Blake, *Employee Agreement Not To Compete*, 73 Harv. L.Rev. 625 (1960)).[3] In this case, Mr. Sutcliffe developed close and personal relationships with plaintiffs' customers, such that he poses a substantial risk of diverting all or part of those customers' business from plaintiffs.

▇▇▇ In addition, plaintiffs have successfully shown that, if Mr. Sutcliffe is not enjoined from breaching the covenant not to compete, they will suffer irreparable harm. Mr. Sutcliffe is engaging in behavior that is likely to result in plaintiffs' further loss of customers as well as customer goodwill. The court determines that such activity is causing irreparable harm because of the "extreme difficulty and uncertainty in restoring goodwill among the customers and regaining the business of customers who are being, and will be, induced away or lost by the plaintiff." *Inter–Collegiate Press*, 519 F.Supp. at 770. Furthermore, the court concludes that any harm the injunction may cause to Mr. Sutcliffe is outweighed by the injury that a failure to impose the injunction may cause to plaintiffs. Mr. Sutcliffe is not prohibited from pursuing a livelihood in his chosen profession; he is merely prohibited from soliciting those customers of plaintiffs

---

**3.** " 'Whether the risk will be sufficiently great to warrant a restriction, and how broad a restriction will be permitted, depends upon the extent to which the employee is likely to be identified in the customer's mind with the product or service being sold.' " *See Eastern Distrib.*, 567 P.2d at 1377 (quoting Professor Harland M. Blake, *Employee Agreement Not To Compete*, 73 Harv.L.Rev. 625 (1960)). The

employer should be given a reasonable period of time to overcome the employee's personal hold over the customers. *See id.* (citing same). This is especially true where "the business is one in which the employee is the sole or primary contact with the customers and in which a close personal relationship with them is fostered." *Id.*

with whom he established a close personal relationship through his employment with plaintiffs. Finally, the court concludes that the public has an interest in upholding enforceable contracts and in preventing unfair competition.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiffs' motion for preliminary injunction (Doc. 22) is granted.

IT IS FURTHER BY THE COURT ORDERED that defendants are hereby enjoined from appropriating, copying, using, or disclosing any of plaintiffs' customer lists that were developed by plaintiffs (including any and all notes concerning plaintiffs' customers that were taken by Mr. Sutcliffe while employed by plaintiffs). This order shall specifically include the appropriation, copying, use or disclosure of the identity of plaintiffs' customers, the identity and telephone numbers of contact persons for plaintiffs' customers, the amounts of previous bids and sales to plaintiffs' customers, and any other notes concerning the solicitation of plaintiffs' customers.

IT IS FURTHER BY THE COURT ORDERED that Mr. Sutcliffe is hereby enjoined from soliciting, marketing, promoting, introducing, or attempting to sell products or services to any Fireworks Spectacular or Piedmont customer listed on Plaintiffs' Exhibits 15 and 17, which were admitted into evidence at the hearing on this motion and which are fully incorporated herein by reference, on behalf of Premier Pyrotechnics or any other fireworks provider.

IT IS FURTHER BY THE COURT ORDERED that plaintiffs shall post a bond in the amount of $50,000, at which time this order shall become effective.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**