NOT DESIGNATED FOR PUBLICATION

No. 120,868

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ESTATE OF ROGER D. SEEMATTER,
COLLEEN E. SEEMATTER, EXECUTOR, and COLLEEN E. SEEMATTER,
*Appellants*,

v.

DELMAR SEEMATTER and SEEMATTER FARMS, INC.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Marshall District Court; JOHN L. WEINGART, judge. Opinion filed September 11, 2020. Affirmed in part, reversed in part, and remanded with directions.

*P. Bernard Irvine*, of Morrison, Frost, Olsen, Irvine & Schartz, LLP, of Manhattan, for appellants.

*Jay F. Fowler* and *Amy S. Lemley*, of Foulston Siefkin LLP, of Wichita, and *John McNish*, of Bolton & McNish, LLC, of Marysville, for appellees.

Before MALONE, P.J., MCANANY, S.J., and BURGESS, S.J.

PER CURIAM: In this appeal we consider a family dispute over the disposition of the farming operation and farm properties of Delmar Seemater in Marshall County. The appellant is Colleen Seematter, the widow and executor of the estate of her late husband Roger Seematter, one of Delmar's sons. Shortly before Roger's death, Colleen and Roger sued Delmar and the family farming corporation, claiming Delmar had broken an oral promise to bequeath the farming corporation and his personal farm properties to Roger in exchange for Roger having worked on the farm for his entire life. They claimed monetary damages of $4,397,220.90. They also claimed that they had not been adequately

1

compensated for the labor and services they provided to Delmar and the corporation. Upon Roger's death, Colleen was substituted as the executor of Roger's estate.

Delmar counterclaimed to enforce his right to repurchase, at its current fair market value, the home and surrounding four acres he and his corporation had quitclaimed to Colleen and Roger so that they could build a new home.

Summary judgment motions were filed by both sides. The district court granted summary judgments against Colleen, individually and as executor of Roger's estate, on each of her claims and in favor of Delmar on his counterclaim to enforce the right to repurchase the real estate previously deeded to Colleen and Roger. The court ordered specific performance on this counterclaim, finding that the fair market value of the property was $258,000.

Colleen appeals.

The parties are well acquainted with the controlling facts that led to this dispute. They are set forth in the parties' statements of uncontroverted facts used to support or oppose the various summary judgment motions. Likewise, the parties are intimately acquainted with the various proceedings before the district court which led to this appeal. Accordingly, it is unnecessary to recount all of those matters here. It would be best to move directly to the legal issues the parties raise on appeal and our analysis of those claims and arguments. Throughout our discussion we will collectively refer to the claims of Colleen in her individual capacity and as executor of her late husband's estate as "Colleen's claims" and the counterclaims of Delmar and the corporation as "Delmar's claims" unless clarity requires otherwise.

Colleen raises four issues on appeal:

2

● The district court improperly granted summary judgment on her promissory-estoppel claim.

● The district court improperly granted summary judgment on the unjust-enrichment claim.

● The district court improperly granted summary judgment on Delmar's repurchase counterclaim.

● The district court's determination of the fair market value of her residence, which was the subject of the repurchase provision in the deed, was not supported by substantial competent evidence.

The first three issues are challenges to the district court's order granting summary judgment. The standards for granting summary judgment are well known to the parties and can be found in *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018). We need not repeat them here. We apply those same standards in our de novo review. Because we are considering these motions anew, we consider not only the arguments raised in the parties' appellate briefs but also the arguments raised in their briefs before the district court along with the various documents attached to their briefs.

Colleen's fourth issue challenges the district court's fact-finding regarding the fair market value of the property, which is subject to Delmar's claimed repurchase right. We review those findings for supporting substantial competent evidence. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 54, 392 P.3d 68 (2017). Substantial evidence is such legal and relevant evidence as a reasonable person might regard as enough to support a conclusion. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009).

*Colleen's Promissory Estoppel Claim*

Colleen claims that Delmar told his son Roger that if he stayed on after finishing school and continued to work the farm, the farm, consisting of the farm corporation and Delmar's personal land holdings, eventually would be his. In fact, Roger did work the farm until his final illness prevented him from doing so. Thus, according to Colleen, Delmar, who outlived Roger, is estopped to deny this promise he made to Roger and Delmar's breach of this promise caused $4,397,220.90 in damages, an amount which we are told constitutes Delmar's entire net worth.

Delmar denies he made any such promise, and he disputes that Roger's work on the farm was predicated on or induced by any promise Colleen claims he made. To the contrary, Delmar argues that their farming arrangement was mutually beneficial. Moreover, even assuming the promise was made to Roger, he has since passed away.

Delmar argues that Colleen failed to present evidence on any of the elements of promissory estoppel. He contends that there is no admissible evidence that Delmar ever promised the farm or farm corporation to Roger. Moreover, Delmar asserts that Colleen's testimony about what Roger believed his father promised to do was inadmissible hearsay under K.S.A. 2019 Supp. 60-460 and her affidavit about a conversation she had with Delmar and Roger contradicted her early deposition testimony and should not be considered.

We begin with the nature of promissory estoppel. A party's reasonable reliance on a promise by making a reasonable change in position effectively replaces the bargained-for consideration necessary for a formal contract and creates what amounts to a contractual relationship. *Berryman v. Kmoch*, 221 Kan. 304, 307, 559 P.2d 790 (1977). Promissory estoppel exists to prevent someone from making a promise and then escaping

4

liability because the promise was not in writing. See *Decatur Cooperative Association v. Urban*, 219 Kan. 171, 178-79, 547 P.2d 323 (1976).

Promissory estoppel requires both misrepresentation by the promisor and detrimental reliance by the promisee. *Bittel v. Farm Credit Svcs. of Central Kansas, P.C.A.*, 265 Kan. 651, 662, 962 P.2d 491 (1998). A plaintiff asserting promissory estoppel must present facts to support this theory when opposing a motion for summary judgment. *10th Street Medical v. State*, 42 Kan. App. 2d 249, 256-57, 210 P.3d 670 (2009). Those facts must show: "(1) the promisor reasonably intended or expected the promisee to act in reliance on the promise; (2) the promisee acted reasonably in reliance on that promise; and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." 42 Kan. App. 2d at 256. Moreover, the promise itself must be defined with sufficient particularity as to what the promisor promised to do. See *Hays v. Underwood, Administrator*, 196 Kan. 265, 267-68, 411 P.2d 717 (1966) ("[I]n order for an agreement to be binding it must be sufficiently definite as to its terms and requirements as to enable a court to determine what acts are to be performed and when performance is complete.").

Colleen brings this promissory estoppel claim not on her own behalf but as executor of Roger's estate. She states in her appellate brief: "The Petition filed by Roger Seematter was <u>his</u> claim, and is now the claim of his Estate. . . . Because of Roger's untimely death, Roger's claim is now advanced by his Estate."

According to Colleen, she and Roger frequently spoke about Roger's expectation that he would inherit the farm and the corporation. But that was under the assumption that Delmar would die before Roger. There was never any discussion about what would happen if Roger died before Delmar. These, of course, are all hearsay statements, and Delmar has objected to them. Let us assume for the sake of argument that Colleen can qualify these statements under some exception to the hearsay rule. Aside from these

5

statements, the evidence on the estate's claim comes from Colleen who describes a direct conversation she had with Delmar. She stated in an affidavit:

> "On June 1, 2014, during Roger's illness, Roger and I were walking on our lane and Delmar drove down the lane to get gas. Understanding Delmar's promise that Roger would get the Corporation, Roger and I stopped Delmar Seematter and asked what was going to happen to the one-half of the 160 acre tract owned by Delmar Seematter. Delmar indicated that Roger would receive the Corporation, which included its ½ share of the tract, and also receive Delmar's ½ interest in the tract."

Delmar argues that Colleen's affidavit containing this statement from Delmar is an improper attempt to contradict her earlier deposition testimony. In her earlier testimony, Colleen testified that she did not know the date of this conversation with Delmar but that

> "Delmar came down to get gas with Barb's car, and we had a conversation about his personal ground that Delmar owned personally.
>     "And it was intended that Roger was going to get that along with the corporation, what Roger . . . knew, that I knew from Roger. And I asked Delmar about it, and Delmar agreed. . . . It would all be in his will."

We fail to see the contradiction. We do not find anything improper about Colleen's affidavit. Considering Colleen's affidavit, her deposition testimony, and Roger's statements which—for the sake of argument— we consider to be admissible under some hearsay exception, there is evidence which contradicts Delmar's denial that the promise was made. This would ordinarily create an issue of fact for resolution at trial. But not here.

As the executor of Roger's estate, Colleen is charged with collecting the assets of the estate and distributing them in accordance with Roger's will. In doing so, she essentially claims that at the time of his death on November 11, 2014, Roger had a cause of action against his father which survived his death and which she is now pursuing for

the estate. But on the day Roger died he had no cause of action against Delmar. On that date, Roger claimed that Delmar had promised to leave his entire estate to Roger in exchange for Roger having spent his entire life on the farm. But Delmar was still alive on that date.

Over the years, Delmar made a number of wills, testamentary trusts, and an intervivos trust which, as of the date of Roger's death, was the latest expression of Delmar's distributive intent. Delmar placed in the trust two parcels of real estate, his farm machinery and equipment, his growing crops and stored grain and hay, and his stock in the farm corporation. The primary beneficiaries of the trust were Delmar and his wife, Barbara; and Delmar's sons, Roger and Bud.

The trust provided that upon Delmar's death and the death of Barbara, Roger and Bud would share the trust income for life. But if either Bud or Roger predeceased Delmar or Barbara, then that son's share of the trust income would end and all net income from the trust would be paid to the surviving brother. Upon the deaths of both Roger and Bud, the trust was to end and the trust assets then would be distributed among Delmar's grandchildren, that is, Bud's surviving children.

The trust certainly did not leave the farm and the corporation to Roger as Roger claimed he had been promised. But the trust was a revocable trust. Delmar reserved the right to amend or revoke the trust at any time during his lifetime. Only Delmar's death cast the provisions of this trust agreement in stone. If Delmar had predeceased Roger with this trust instrument in place and unchanged, Roger could show a breach of the contract he asserted. But Delmar survived Roger. So on November 11, 2014, Roger had no cause of action to pass on to his estate because Delmar had not on that date breached it.

Under these uncontested facts, and viewing them in the light favoring Colleen, against whom summary judgment is sought, we find no genuine issue of material fact to preclude summary judgment in Delmar's favor on Colleen's claim of promissory estoppel. Delmar is entitled to judgment as a matter of law on this claim.

*Colleen's Unjust Enrichment Claim*

Colleen next argues that the district court improperly granted summary judgment to Delmar and the farm corporation on her unjust enrichment claim. "[U]njust enrichment arises when (1) a benefit has been conferred upon the defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Estate of Draper v. Bank of America*, 288 Kan. 510, 518, 205 P.3d 698 (2009); see also *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 176, 910 P.2d 839 (1996) ("'The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to [another].'").

Colleen argues that there is a genuine issue of material fact on this claim which precludes summary judgment because of the factual dispute over "whether the compensation received by Roger and Colleen was adequate under the circumstances." She asserts that she and Roger conveyed many benefits to the corporation with little or no compensation in return. She acknowledges that Roger received some benefits, but she asserts that Delmar and the corporation have never shown that those benefits equaled or exceeded the value of the couple's labor.

In order for this claim to survive summary judgment, Colleen must come forward with admissible evidence on each of the three elements. The burden is on her to come forward with evidence establishing the value of the labor and services—i.e., the benefit—that she and Roger conferred on Delmar and the corporation. See *Drouhard-Nordhus v.*

8

*Rosenquist*, 301 Kan. 618, 623, 627, 345 P.3d 281 (2015). Colleen has not provided any such evidence to create a genuine issue of material fact. When questioned by Delmar's attorney during her deposition, Colleen said that neither she nor Roger had attempted to value their labor and services, stating that she "couldn't even fathom a guess":

"Q. Did Roger ever attempt to value the services that he was providing that you make reference to in your lawsuit?

"A. The value?

"Q. Yes, ma'am.

. . . .

"A. I—I couldn't fathom to even guess.

"Q. Well, your—your allegation in your lawsuit says under Count No. II, Unjust Enrichment, paragraph 39, 'That plaintiffs have provided valuable services and labor to defendants with the expectation of being compensated.'

. . . .

"[Colleen's Attorney]: Would your repeat the question?

"[Colleen]: Yes, Please

"Q. (By [Delmar's Attorney]) My question specifically is, did you or Roger either one attempt to value or quantify in a monetary amount the services and labor that you make reference to in this paragraph?

"A. No.

"Q. Do you have any estimate of the value in a monetary amount of the services and labor that would be the subject matter of this lawsuit?

"A. No."

There is ample evidence in the record of the amount or value of the compensation, benefits, shares of farm profits, forgiven loans, gifts, and conveyances Delmar and the corporation made to Roger and Colleen in exchange for their work on the farm. But without any evidence of the value of the services Colleen and Roger provided, there is nothing by which a jury could determine that the compensation and other benefits provided by Delmar and the corporation were so deficient that Delmar and the corporation were unjustly enriched at the expense of Colleen and Roger. Colleen has

9

failed to come forward with evidence on this essential element of the cause of action in order to create a genuine issue of material fact which would defeat summary judgment. Delmar and the corporation are entitled to summary judgment on Colleen's unjust enrichment claim.

*Delmar's Counterclaim to Repurchase the Property*

Some background facts are necessary. The house in question, referred to as the Keystone House, is part of the family farm and had been in Delmar's family going back at least as early as Delmar's grandmother. When Delmar married Carol, the Keystone House became the family home for them and their children. In about 1980, Delmar and Carol divorced. Delmar and Roger continued to live in the house. Sometime in the 1980s Delmar purchased the Keystone House along with the family farm—half in Delmar's individual name and half in the name of the farm corporation.

In 1985, Delmar remarried and he and his new wife, Barbara, moved from the Keystone House but Roger remained.

After Roger and Colleen married in 1997, they lived in the Keystone House rent-free. But, according to Colleen, she and Roger had to make significant repairs to the house over the years because it was in a dilapidated condition, a great deal of maintenance had been deferred, and the house was infested by rodents. Delmar denies that Keystone House was in this dilapidated condition or rodent infested. But in any event, Delmar agreed that Roger and Colleen could tear down the old house and erect a new, modular home on the property. The house was torn down and a new basement was constructed. At that point the couple needed a loan to complete the project. In order to obtain a loan, the couple needed to own at least four acres surrounding the home. Delmar agreed to convey this additional property to them so they could complete the project.

According to Colleen, Delmar presented to her and Roger an unsigned quitclaim deed which contained no repurchase provision and they took the unsigned deed to the bank to obtain financing. Delmar denies preparing this deed. He contends that Roger worked with an attorney to prepare this deed. According to the banker's affidavit, Roger brought to the bank the unsigned quitclaim deed with no repurchase provision in order to provide the bank with a legal description of the property.

Thereafter, Delmar, individually and on behalf of the farm corporation, executed a deed on September 27, 2007, quitclaiming to Roger and Colleen the four acres on which the house was being built. Roger and Colleen paid $2,000 for the half owned by the farm corporation and Delmar gifted the other half to them. Unlike the earlier deed Roger took to the bank, this deed contained the following: "In case of death of either Grantee or dissolution of Grantees' marriage, Grantors reserve the right to purchase the subject property, together with any improvements thereon, at fair market value."

There was no written purchase contract between the parties. Delmar asserts that he and Roger discussed the repurchase provision before the deed was executed. When shown the recorded deed with the repurchase provision at her deposition, Colleen testified, "They didn't give us this deed. . . . We never seen this deed until May [2016] when [Colleen's lawyer] brought it to our attention." She testified that she never discussed the repurchase provision with Delmar and had no knowledge of it until May 2016. But Jacqueline Doebele stated in her affidavit:

> "Colleen told me that the only way that Delmar would agree to give Roger and Colleen the land to build a new house was if there was a stipulation that he could buy back the land and the new house. I remember this specifically because Colleen was very angry that Delmar would even think that Roger and Colleen would ever get divorced."

11

The property is surrounded by the family farm. According to Delmar, he did not want to compromise the overall value of the farm by alienating "a chunk of land from the middle of it." Besides, Delmar says he wanted to make sure the property stayed in the family.

Roger was diagnosed with Lou Gehrig's disease in April 2013. He died in November 2014, less than a month after this suit was filed. Delmar sought to exercise this repurchase provision after Roger's death. When Colleen refused to cooperate, he asserted a counterclaim in this action to enforce this repurchase provision and moved for summary judgment on his counterclaim. In response Colleen argues that the statute of frauds, K.S.A. 33-106, and Article 15, § 9, of the Kansas Constitution bar enforcement of this repurchase provision in the deed. In response, Delmar asserts that acceptance of the recorded deed containing the repurchase provision satisfies the statute.

We turn to the two central issues before us: (1) whether the repurchase provision in the deed is unenforceable because it violates the statute of frauds and (2) whether enforcing this repurchase provision violates Colleen's constitutional and statutory homestead rights.

*Statute of Frauds*

Colleen argues that the contractual repurchase provision in the recorded deed violates the statute of frauds and is unenforceable against her in the absence of a signed writing by Colleen.

Delmar counters that Roger and Colleen accepting the deed satisfies the signature requirement of the statute of frauds. That statute requires that an enforceable contract for the sale of real estate be in writing and signed by the party against whom enforcement is sought:

12

"No action shall be brought . . . upon any contract for the sale of lands . . . unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing." K.S.A. 33-106.

It does not appear that our Supreme Court has taken a position on this issue. In *Jeremiah 29:11, Inc. v. Seifert*, 284 Kan. 468, 161 P.3d 750 (2007), the court considered the enforceability of a restrictive covenant contained in a recorded deed unsigned by the original parties to be bound by the covenant. Our Supreme Court noted, "[d]espite all of the energy invested in arguing other issues . . ., the outcome of this case simply does not turn on . . . whether the statute of frauds was satisfied." 284 Kan. at 475. So the law on this issue remains uncertain in Kansas.

But other jurisdictions have considered the issue. While not binding on us, the near consensus among other jurisdictions considering the matter is that acceptance of a deed amounts to a signature that satisfies the statute of frauds. The degree of accord among other jurisdictions suggests that Colleen cannot rely on the statute of frauds to prevent enforcement of the right-to-repurchase agreement. See, e.g., *Murphey v. Gray*, 84 Ariz. 299, 305, 327 P.2d 751 (1958) ("The acceptance of the deed by Louise N. Grace bound her, as the grantee, to the performance of the restrictions as effectively as if she had executed the instrument."); *Carlson v. Libby*, 137 Conn. 362, 368, 77 A.2d 332 (1950) ("[B]y the fact that Valvoline Oil Company accepted the deed in which it was stated that it agreed that Cheney Brothers should have the right to use the siding, the oil company bound itself to that covenant even though it did not sign the document."); *Thodos v. Shirk*, 248 Iowa 172, 179, 79 N.W.2d 733 (1956) ("The acceptance of the deed amounts to an adoption of the signature of the grantor as that of the grantee also, so that the requirement of the Statute of Frauds as to signatures is considered satisfied."); *Mearida v. Murphy*, 106 Ill. App. 3d 705, 709, 435 N.E.2d 1352 (1982) ("It is settled in

13

Illinois that the acceptance by the grantee of a deed . . . binds the grantee to the performance of the agreement as effectually as if he had signed the deed."); *Walters v. Sporer*, 298 Neb. 536, 557, 905 N.W.2d 70 (2017) ("We are persuaded by the great weight of authority that the acceptance of a deed operates to satisfy the requirement, under [the statute of frauds], that the contract creating an interest in land be signed by the party to be charged therewith."); *Harris & Gurganus, Inc. v. Williams*, 37 N.C. App. 585, 246 S.E.2d 791 (1978) ("The delivery and acceptance of a deed takes covenants contained therein out of the operation of the statute of frauds."); *Fleet v. Webber Springs Owners Ass'n, Inc.*, 235 W. Va. 184, 190, 772 S.E.2d 369 (2015) ("By accepting the conveyance, the Homeowners necessarily are bound by the covenants and restrictions contained therein, even though they did not, themselves, sign the deeds.").

Colleen relies on an outlier decision on this issue. She cites *McMillan v. Ingolia*, 87 Ill. App. 3d 727, 730-31, 410 N.E.2d 162 (1980), in which the court held that a repurchase option in a deed in favor of the grantors is unenforceable without a writing, even if the grantees accepted the deed. But two years later in *Mearida*, 106 Ill. App. 3d 705, a different panel of the Illinois appellate court concluded that *McMillan* was wrongly decided. There, the court stated:

> "It is settled in Illinois that the acceptance by the grantee of a deed conveying an interest in land and containing a covenant or agreement to be performed in the future, followed by the grantee's entering into possession of the premises, binds the grantee to the performance of the agreement as effectually as if he had signed the deed." *Mearida*, 106 Ill. App. 3d at 709.

We adopt the consensus view of other appellate courts around the country and conclude that Roger and Colleen accepting the deed containing the repurchase provision, taking possession of the property, and building their home on it satisfies the statute of frauds. Colleen is contractually bound to it unless there is some other basis for avoiding it.

14

*Constitutional and Statutory Homestead Right*

Colleen argues that even if the repurchase provision is enforceable under contract law because it does not violate the statute of frauds, it is still not enforceable because of her constitutional and statutory homestead rights to the property which have priority over Delmar's claimed contract right.

The Kansas Constitution, Article 15, § 9, states:

"A homestead to the extent of one hundred and sixty acres of farming land, or of one acre within the limits of an incorporated town or city, occupied as a residence by the family of the owner, together with all the improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists; but no property shall be exempt from sale for taxes, or for the payment of obligations contracted for the purchase of said premises, or for the erection of improvements thereon."

K.S.A. 2019 Supp. 60-2301 also provides, in relevant part, that a homestead occupied by the owner as a residence

"shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists; but no property shall be exempt from sale for taxes, or for the payment of obligations contracted for the purchase of such premises, or for the erection of improvements thereon."

To alienate has been defined as "[t]o transfer or convey (property or a property right) to another." Black's Law Dictionary 91 (11th ed. 2019). In the context of our constitutional homestead provision, alienate means "a parting with or surrendering of some interest in the homestead." *State, ex rel. v. Mitchell*, 194 Kan. 463, 465, 399 P.2d 556 (1965).

Colleen argues that the facts of this case do not fall under any of the three enumerated exceptions to constitutional or statutory homestead protections. She contends that the language in the Constitution and in the statute is clear. Citing *West v. Grove*, 139 Kan. 361, 31 P.2d 10 (1934), she notes that "[t]he manner in which the homestead may be alienated is expressly stated, as are the circumstances against which the homestead right shall not prevail," and that Kansas courts liberally construe the homestead provision. Indeed, Kansas courts continue to state that principle. See, e.g., *Redmond v. Kester*, 284 Kan. 209, 212, 159 P.3d 1004 (2007).

Delmar cites *In re Estate of Dahn*, 204 Kan. 535, 464 P.2d 238 (1970), for the proposition that while Colleen had a homestead right in the property upon transfer by quitclaim deed, the extent of that right can be no greater than the interest that was quitclaimed to her in the deed which contained the repurchase provision.

In *Dahn*, Louis Dahn and his wife, Mamie, purchased a mobile home on a conditional sale installment contract which they both signed. The mobile home seller had assigned the conditional sale installment contract to the bank with recourse. Louis died six years later, and Mamie continued to reside in the mobile home but was unable to keep up the payments. The bank reassigned the contract back to the mobile home seller who sold the mobile home at a public sale, resulting in a deficiency on the contract which the mobile home seller reduced to a judgment against Mamie.

In Louis' probate proceedings, Mamie claimed a homestead interest in the mobile home under the probate homestead exemption in K.S.A. 59-401. The district court stated that under the probate homestead exemption, Mamie had a homestead interest in the mobile home which she and Louis occupied as a home at the time Louis died. But the Supreme Court found her homestead interest was subject to the terms of the purchase

16

contract, quoting the following from *Stafford v. Woods*, 144 Ill. 203, 210, 33 N.E. 539 (1893):

> "'But it seems too plain for argument that the estate of homestead can in no case be more extensive than the interest to which it attaches, and of which it forms a part. If the householder has an estate in fee, the estate of homestead may likewise be a fee; but, if the householder has only an estate for life or for year, the estate of homestead will expire at his death, or at the expiration of the term for years.'" *In re Estate of Dahn*, 204 Kan. at 539.

Delmar apparently cites *Dahn* for the court's reference to *Stafford*. But the operative fact in the case relevant to us today is that Mamie signed the conditional sale installment contract for purchase of her homestead—the mobile home—and defaulted on it. As such, our constitutional homestead protection does not extend to sales "for the payment of obligations contracted for the purchase of said premises." See Kan. Const. art. 15, § 9.

Delmar also cites *Clark v. Axley*, 162 Kan. 339, 176 P.2d 256 (1947), for support. There, the rather convoluted facts disclose that Axley executed two mortgages in 1934. In 1938, Axley and his wife deeded the mortgaged property to Hayes, subject to the mortgages. Hayes turned around and resold the property that same year to Clark, again subject to the mortgages.

In 1943, in the face of foreclosure threats from the mortgagees, Clark contracted with Axley to reconvey the property back to Axley subject to the mortgages in exchange for Axley assuming the mortgage loans and bringing the loans up to date. They further agreed that both parties would try to sell the property within two years and, if sold, the parties would split the profits. Axley agreed that in the event of such a sale he would execute a deed conveying the property to the buyer.

17

In 1945, Clark contracted with Cradit to sell him the property. They agreed that Clark would arrange for Axley to execute a deed conveying the property to Cradit. Clark demanded that Axley execute the deed but Axley refused and a suit followed. One of Axley's defenses was that Clark's claim was barred by the homestead rights of Axley's wife because she did not sign the contract with Clark that led to the eventual sales contract with Cradit.

On appeal, the Supreme Court stated:

"It is also suggested by [Axley] that under the facts alleged [Clark] may not recover because of our homestead laws, and our attention is directed to the rule that specific performance for the conveyance of a homestead cannot be compelled where the husband alone signed the contract without the knowledge or consent of the wife, citing *Brown v. Gilpin*, 75 Kan. 773, 90 P. 267; *Thompson v. Millikin*, 102 Kan. 717, 172 P. 534; *Tucker v. Finch*, 106 Kan. 419, 188 P. 235; *Banta v. Newbold*, supra. The rule stated is correct but its application here is not. At the time the deed from [Clark] to [Axley], dated February 13, 1943, was executed, and the contract of the same date between the same parties was made providing for delivery of the deed to [Axley] upon his performing his obligations under the contract, the real estate belonged to [Clark], and [Axley] and his wife had no homestead interest in the real estate. At the time the contract was made the wife of [Axley] had no homestead rights in the real estate, she was not a necessary party to the contract between [Clark] and [Axley], and the fact that [Axley] and his wife may, after the deed to him was delivered, have established a homestead on the real estate, did not make the previously executed contract unenforceable under any homestead law theory. The rights of [Axley's] wife could rise no higher than their source and were subject always to the conditions under which [Axley] obtained title to the real estate and as fixed by the contract of February 13, 1943." *Clark*, 162 Kan. at 343-44.

The outcome in *Clark* is predicated on the fact that Axley and his wife had no homestead rights in the property when the 1943 contract with Clark was entered into. The Axleys had sold the property in 1938, and the property was not reconveyed to them until 1943.

18

Axley's wife had no homestead rights when her husband entered into the contract with Clark.

But holding an outright fee simple title is not essential to claiming a homestead. As early as 1875, our Supreme Court recognized that an equitable interest in property is sufficient to support a homestead claim. *Tarrant v. Swain*, 15 Kan. 146, 148 (1875). In *In re Estate of Fink*, 4 Kan. App. 2d 523, 532, 609 P.2d 211 (1980), the court stated:

> "The establishment of a homestead interest does not depend upon being the titleholder of the property in question. Those persons referred to in the homestead provisions of the Kansas Constitution and statutes may enjoy a homestead interest, but not an interest rising to the rank of an estate."

In *Redmond*, 284 Kan. at 216, in answering a certified question, the court stated that homeowners who transferred legal title to their home to an inter vivos trust for their own benefit did not lose their homestead rights because they retained an equitable interest in the home which was sufficient, so long as they continued to live in the home. The *Redmond* court concluded:

> "Following the precedent established since the inception of the Kansas Constitution, we hold that debtors may claim the homestead exemption based on any interest in real estate, whether legal or equitable, as long as the debtors have not abandoned their occupation of or intent to occupy the real estate. Accordingly, the term 'owner' as used in K.S.A. 60-2301 applies to the holder of any interest in real estate, regardless of whether the interest is in fee simple." 284 Kan. at 216.

One of the cases cited with approval in *Redmond* is *Moore v. Reaves*, 15 Kan. 150 (1875), which stands for the proposition that the equitable owner of an interest in real estate who occupies it as his homestead cannot transfer his equitable interest without consent of his wife. See *Redmond*, 284 Kan. at 212.

In *Moore*, Payne entered into a contract for deed with the railroad, the owner of the property. Before the contract was fulfilled, Payne assigned the contract for deed to Jones who, in turn, assigned the contract to Reaves. Reaves and his wife took possession of the land and occupied it as their homestead. Eight months later, Reaves indorsed the contract in blank and gave it to Lappin as security for a $150 loan from Lappin. Reaves' wife did not sign the indorsement of the contract. Reaves and his wife continued to occupy the home as their homestead, and Reaves made improvements to the property and made payments on the contract to the railroad. The court stated:

> "The blank assignment to Lappin, even if it had been valid, would have been nothing more than a conditional alienation of the [Reaves'] equitable interest in said land, in the nature of a mortgage to secure the payment of said $150 note, and would not have been an absolute conveyance to Lappin . . . of [Reaves'] equitable title. But as the assignment was of land held by [Reaves] as his homestead, and was made by [Reaves] alone, without the consent of his wife, the assignment itself was and is absolutely void." 15 Kan. at 152-53.

In another case citied by the *Redmond* court with approval, *Cole v. Coons*, 162 Kan. 624, 633, 178 P.2d 997 (1947), the court stated:

> "We are not holding that it is always essential, in order to establish a homestead right upon real property, that the husband or wife shall have had full title to the property. A homestead right of occupancy may be established upon a cotenancy title, an equitable title, or an *executory contract to purchase*, a leasehold estate, or an estate for life, as against almost any class of claimants except cotenants." (Emphasis added.)

Roger and Colleen were dissatisfied with the Keystone House. They wanted to tear it down and build a new one. Delmar gave them permission to do so. Bank financing of the new home required that Roger and Colleen own the surrounding four acres. So an oral contract was entered into for Delmar to convey to Roger and Colleen the necessary

20

four acres, which included the land on which the Keystone House sat and the new home would be constructed. Delmar was willing to gift his one-half interest in the property to Roger and Colleen. But he was unwilling to give away the remaining one-half interest owned by the farm corporation—even though he owned 1,999 of the 2,000 outstanding shares of the corporation and Roger owned the sole remaining share. So the agreed consideration for the sale was $2,000.

At that point, and before the recording of the quitclaim deed in September 2007—over five years before the diagnosis of Roger's fatal illness—there existed an executory contract to purchase the four acres upon which Roger and Colleen intended to construct a new home to replace the home they had been occupying on the property for many years. Under the holding in *Cole*, at that point Roger and Colleen had a homestead right in the property which predated the closing of the transaction. After the closing, Colleen and Roger continued to live on the property as their homestead until Roger's death, and Colleen continued to maintain her homestead after Roger's death at least up to the time her deposition was taken in June 2016.

In completing the sales transaction, Delmar and his corporation included in the quitclaim deed the repurchase provision which neither Roger nor Colleen signed. Delmar and the corporation quitclaimed to Roger and Colleen "the whole estate to vest in the survivor in the event of the death of either" but subject to (1) visible and recorded easements, restrictions, and rights of way; (2) a reserved right of access for Delmar and the corporation to and from other property they own that may otherwise be inaccessible (but also giving Roger and Colleen right to use an existing lane for access to and from their property); and (3) Delmar's right to repurchase the property on the conditions we have been discussing.

Delmar claims that both Roger and Colleen knew about this repurchase provision before the closing of the sale and agreed to take the property subject to it. Colleen claims

she had no knowledge of this repurchase provision until her lawyer discovered it and showed it to her during the course of discovery in this suit.

Now that Roger has died, Delmar seeks to repurchase the property, which is Colleen's homestead. Colleen has refused to alienating the property by executing a deed in his favor, claiming she never agreed to Delmar having this repurchase right.

In this context, the statute of frauds and its exceptions do not control because the consent of a spouse to the alienation of the homestead does not require that the consent be in writing. Thus, while acceptance of a deed containing the repurchase provision may constitute some evidence of consent in the appropriate circumstances, it does not control. As stated in *Pilcher v. A.T.&S.F. Rld. Co.*, 38 Kan. 516, 525, 16 P. 945 (1888):

> "The only way to bind the wife to an alienation, lien, incumbrance, contract of sale, lease, or any interest whatever in the homestead that will interfere with or deprive her of the free use, occupancy, and enjoyment of all and every part thereof, is her consent freely given, jointly with that of her husband. The fact of joint consent is best evidenced by a writing to that effect; but the constitution does not in express terms require that it shall be so shown, and hence it can be established by such facts and circumstances as the necessity of particular cases require. Probably no greater amount of evidence or more strict proof will be required to establish it than is deemed necessary to establish any other material fact, but there certainly must be some showing of joint consent, as required by the constitution."

As similarly stated more recently in *Mitchell*, 194 Kan. at 466:

> "It suffices to say that Kansas has zealously protected the family rights in homestead property by liberally construing the homestead provision in order to safeguard its humanitarian and soundly social and economic purposes; and nothing less than the free consent of the resident owner of the homestead, and joint consent of husband and wife

22

where the relation exists, will suffice to alienate the homestead, except under the specified exceptions provided in the constitution." 194 Kan. at 466.

See *State ex rel. Braun v. Tract of Land*, 251 Kan. 685, 686-88, 840 P.2d 453 (1992).

Delmar says the repurchase provision was an essential part of the deal that he discussed with Roger. According to Jacqueline Doebele, Colleen knew that Delmar would give her and Roger the land they needed only if she agreed to a repurchase agreement. Colleen contends she knew nothing of this at the time and did not give her consent when she and Roger acquired the property.

There remains a genuine issue of material fact as to whether Colleen consented to this repurchase provision which would ultimately compel her to convey her homestead back to Delmar if Roger should predecease both her and Delmar.

Under these circumstances, summary judgment is not appropriate on this counterclaim, and the case is remanded for further proceedings on this counterclaim.

*The Fair Market Value of the Property*

Because we have determined that Delmar's repurchase claim must be remanded for further proceedings, there is no need to address whether there is substantial evidence to support the district court's determination of the fair market value of Colleen's homestead.

Affirmed in part, reversed in part, and remanded for further proceedings.

23